Dr. Margaret T. CUSSLER

v.

The UNIVERSITY OF MARYLAND
et al.

Civ. A. No. 72–372–N.

United States District Court,
D. Maryland.

April 14, 1977.

Sylvia Roberts, Baton Rouge, La. (and Stephen H. Sachs, Ann M. Turnbull and Frank, Bernstein, Conaway & Goldman and Ann F. Hoffman, Baltimore, Md.), for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland, David H. Feldman, Asst. Atty. Gen. of Maryland and Francis D. Murnaghan, Jr. and Nell B. Strachan, Baltimore, Md., for defendants.

NORTHROP, Chief Judge.

## INTRODUCTION

Plaintiff, Dr. Margaret T. Cussler, a sociology professor at the College Park Campus of the University of Maryland, filed her original complaint pursuant to 42 U.S.C. § 1983, alleging that she was denied promotion, salary increases and other beneficial employment conditions on the basis of her sex and in retaliation for her public allegations of sex discrimination. She named as defendants, the University of Maryland and its Board of Regents, Dr. Wilson H. Elkins, President of the University of Maryland, Dr. R. Lee Hornbake, Vice President for Academic Affairs, Dr. Charles E. Bishop, Chancellor of the College Park Campus, Dr. Robert A. Ellis, Head of the Department of Sociology, and Dr. Robert K. Hirzel, Associate Professor in the Department of Sociology. Subsequently, plaintiff amended her complaint to include an allegation of arbitrary and capricious conduct and a separate claim under Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, 42 U.S.C. § 2000e et seq. On October 1, 1976, the Court entered an order granting the Board of Regents' motion for summary judgment and the University of Maryland's motion for summary judgment on the issue of damages under section 1983.

The case then proceeded to trial before a jury on November 23, 1976, with the jury to determine the issues of compensatory and punitive damages against the individual defendants under section 1983 and the Court to determine the issues of equitable relief under section 1983 and Title VII. On March 24, 1977, the jury returned a verdict in favor of each of the individual defendants. This memorandum represents the Court's findings of fact and conclusions of law on the issues that remain for the Court's resolution.

## FACTUAL BACKGROUND

Plaintiff received her Ph.D. degree in 1943 from Radcliffe and Harvard University. Her first term of employment with the University of Maryland began in 1947 at the rank of instructor and continued until 1951 when she left, after attaining the rank of assistant professor, to accept employment with the federal government. In 1954 she returned to the University of Maryland at the rank of instructor after her government position had been eliminated by a personnel reduction. She was promoted to assistant professor in 1956 and to associate professor in 1962. In both 1970 and 1971, the Tenure and Promotion Committee of the department of sociology considered plaintiff's promotion to full professor and unanimously refused to recommend her for promotion.

The University of Maryland is a large state university with approximately 70,000 students and 5,000 faculty members. The University established general criteria and procedures governing promotion of faculty in 1957. In 1969, the sociology department adopted similar departmental standards for promotion, following the general University guidelines. The criteria include teaching ability, service to the University and, most importantly, publications and other scholarly activity. The standards are especially exacting for promotion to full professor since that position is the highest faculty position at the University. Long years of service are, alone, insufficient to warrant promotion. The procedures involve an initial recommendation from the department and subsequent review by administrators, including the Dean of the College in which the department is located, and the President's Office. The University, however, had not established any procedures or guidelines concerning course or committee

assignments. These assignments involve an evaluation of factors that are unique to each individual department.

### THE TITLE VII CLAIM

█ Title VII of the Civil Rights Act of 1964 provides that:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; . . . . [42 U.S.C. § 2000e–2(a)].

Title VII, however, was inapplicable to educational institutions until March 24, 1972, the effective date of the amendment deleting the exemption for educational institutions. Since the 1972 amendments are not retroactive, Title VII does not provide a remedy for discrimination suffered by plaintiff before March 24, 1972. *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975).

Since all of the allegations in the complaint concern activities prior to March 24, 1972, defendant, University of Maryland, contends that plaintiff has not alleged any actions for which it may be held liable under Title VII. Plaintiff, however, continued in her employment with the University after March 24, 1972. She therefore may obtain relief under Title VII to remedy the present and continuing effects of discrimination that occurred prior to March 24, 1972. *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 1006–07 (E.D.Pa.1974). For the purposes of determining liability, however, the Court will limit its inquiry to acts occurring before April 17, 1972. In the charge of discrimination that plaintiff filed with the Equal Employment Opportunity Commission, plaintiff designated April 17,

1972, as the most recent date on which discrimination had occurred.

█ In *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court stated that three distinct burdens of proof pertain in a Title VII case. Plaintiff has the initial burden of establishing a prima facie case by showing that:

1. she is a member of a protected class;
2. she applied for and was qualified for a position for which her employer was seeking applicants;
3. despite her qualifications she was rejected; and
4. thereafter the position remained open and the employer continued to seek applicants with plaintiff's qualifications.[1]

If plaintiff establishes the existence of these four elements, the burden shifts to defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. If defendant fails to meet this burden, plaintiff is entitled to judgment without further proof. If it does satisfy this burden, plaintiff has the burden in phase three of showing that the alleged nondiscriminatory reason was in fact a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817.

### *Promotion*

█ Viewing plaintiff's allegations of discrimination in this context, the Court concludes that she has demonstrated no sex discrimination concerning promotion, salary or other conditions of employment that is cognizable under Title VII. In regard to promotion, the Court finds that there was no sex discrimination involved in the decision not to promote plaintiff to full professor. As the courts repeatedly have noted, promotion decisions in academia necessarily involve matters of professional judgment. *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir. 1974); *EEOC v. Tufts*

---

1. Recognizing the various contexts in which Title VII cases arise, the Court noted that the requisite *prima facie* proof may vary in different factual situations. 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. It is unnecessary to determine whether this admonition is applicable to this case, however, because of the manner in which the Court has reached its decision.

*Institute of Learning,* 421 F.Supp. 152, 158 (D.Mass.1975); *Peters v. Middlebury College,* 409 F.Supp. 857, 868 (D.Vt.1976); *Lewis v. Chicago State College,* 299 F.Supp. 1357, 1359–60 (N.D.Ill.1969). The courts are, therefore, reluctant to substitute their judgment for the judgment of academics with expertise in their respective fields. *Green v. Board of Regents of Texas Tech University,* 335 F.Supp. 249, 250 (N.D.Tex. 1971), *aff'd* 474 F.2d 594 (5th Cir. 1973). These misgivings are intensified in this case by the turmoil prevalent on the College Park Campus generally, and the sociology department particularly, during the early 1970's. In the Spring of 1970, there were student riots protesting the invasion of Cambodia. In addition, there was discord between the faculty and the administration concerning their proper areas of authority. The Department also had its own individualized difficulties. It just had completed a four-year period during which it had operated without a department head. This lack of leadership had increased the difficulties of an already weak department. As of 1970, no one in the department of sociology had been promoted to full professor since 1959. With the arrival of Dr. Ellis in 1970 as the new department head, the sociology department began a serious effort to upgrade the quality of the Department. As part of this effort, the Department hired Dr. Dager from the National Science Foundation, who formerly had been a full professor in the sociology department of Purdue University, a ranked department.[2] It is within this factual context that the Court must consider defendant's refusal to promote plaintiff to full professor.

Assuming, *arguendo,* that plaintiff satisfied her burden of establishing a *prima facie* case, the Court finds that defendant denied plaintiff's promotion on the basis of legitimate reasons that were not a pretext for sex discrimination. In a letter to Dr. Callcott, Vice Chancellor for Academic Affairs, Dr. Ellis detailed the reasons for not promoting plaintiff. He cited her reputation for capriciousness in her relationships with students, the poor quality of her publications since her last promotion, and her lack of professionally recognized expertise. These reasons conform to the criteria for promotion established by the University and the sociology department. The criteria emphasize teaching ability, publications and service to the University. The Court finds that these criteria bear a rational and reasonable relationship to the professional duties of a full professor,[3] and that the full professors who evaluated plaintiff for promotion applied these criteria in a nondiscriminatory fashion.

The evidence presented at trial supports each of the reasons that Dr. Ellis stated for not promoting plaintiff. In his testimony, Dr. Ellis described an incident in which plaintiff had acted capriciously towards certain students while he was head of the Department. His testimony was corroborated by the testimony of the students involved in the incident. In addition, several other students described incidents of favoritism and capriciousness. The plaintiff produced no evidence refuting the occurrence of these incidents.

Plaintiff's lack of professionally recognized expertise was confirmed by the testimony of expert witnesses for both sides. All of defendant's experts as well as most of plaintiff's experts indicated that they were not familiar with plaintiff's work before the commencement of this suit.

Most importantly, however, the expert testimony at trial supports the conclusion that plaintiff's publications did not warrant promotion. Although there was some dispute concerning the appropriate time period for reviewing the publications of a candidate for full professor,[4] the Court accepts

---

2. The term "ranked" refers to the attainment of a rating in studies of the quality of sociology departments. Departments below a certain level of quality are unranked. The sociology department of the University of Maryland has never been ranked.

3. The expert witnesses all accepted the validity of the criteria.

4. Generally, defendant's experts stated that only publications after promotion to associate

the opinion of Dr. Kerchoff, plaintiff's expert, that publications after promotion to associate professor are of primary importance. When the Tenure and Promotion Committee last considered plaintiff for promotion in 1971, she had published only one book and one chapter in a book since her promotion to associate professor in 1962. The book chapter contributed little to plaintiff's qualifications for full professor since it was not the product of scholarly research, but rather was a description of the problems of foreign students. Although the book, *Dentists, Patients and Auxiliaries,* represented scholarly research, expert opinion on its quality was divided. The Court, however, finds the negative opinions of defendant's experts more convincing. Defendant's experts were consistent in criticizing the methodology used in the book and the absence of sociological conclusions. These criticisms were similar to those made by the full professors in explaining their reasons for not voting for plaintiff's promotion. In addition, a published review of the book by a noted social psychologist was unfavorable. Finally, the United States Public Health Service, which had provided the funding for the research underlying the book, denied a request for renewal of her funding because of its dissatisfaction with the report on the original grant. In light of the paucity of scholarly productivity following her promotion to associate professor in 1962, plaintiff's pre-1962 publications, though more substantial, were insufficient to warrant promotion.

During trial, plaintiff attempted to establish that she deserved promotion by comparing her qualifications with those of Dr. Dager.[5] This comparison, however, does not advance plaintiff's position. Dr. Dager has demonstrated continuing productivity after his promotion to associate professor by publishing five articles in refereed sociological journals [6] and a chapter on theory in a renowned book. Moreover, the experts for both plaintiff and defendant generally considered Dr. Dager's work to be of good quality.[7] Thus, defendant's decision to hire Dr. Dager as a full professor was entirely consistent with its decision not to promote plaintiff and does not demonstrate that its reasons for not promoting plaintiff were pretextual.

### Salary

█  Plaintiff also alleges that her salary was inordinately low because of sex discrimination. The Court, however, finds that any discrimination that may have existed in regard to salary did not continue beyond March 24, 1972. After Dr. Ellis became Department head in the Fall of 1970, he reviewed the salary of the entire Department faculty. Based on this review, plaintiff and a male professor received substantial increases in salary for the 1971–1972 academic year. After this salary increase, plaintiff had the second highest salary of all the associate professors in the sociology department. She has failed to establish even a *prima facie* case that her qualifications entitled her to a higher salary in the Spring of 1972.

### Course and Committee Assignments

█  Nor can the Court accept plaintiff's allegations that she was discriminated against in course and committee assign-

professor should be considered, and plaintiff's experts stated that the whole record of publications should be considered.

5.  Of the four full professors in the department of sociology in 1970 and 1971, only Dr. Dager's qualifications are relevant because he was the only person to become a full professor during the period when plaintiff was being considered for promotion and the Department was trying to upgrade the quality of its staff.

6.  The significance of articles in "refereed" sociological journals is that other sociologists re-

view the work to determine whether it should be published. Generally, standards are high and only a small percentage of the works actually submitted are eventually published. Therefore, in reviewing a professor's qualifications, one usually can assume that publications in refereed sociological journals are of good quality.

7.  Significantly, Dr. Dager had been a full professor in the ranked sociology department at Purdue University.

ments. The criteria for course and committee assignments are even more difficult to quantify than the criteria for promotion. Such determinations involve the exercising of the department head's professional judgment concerning the needs of the department and the capabilities of the available faculty. Even the University administration is reluctant to interfere with these assignments. Moreover, the needs of the department and the capabilities of the faculty are variable, not static. Therefore, the members of the faculty must be willing to adapt their schedules to conform with the needs of the department and the capabilities of other faculty members. No faculty member has a vested right in any course or committee assignment.

With this understanding of the nature of course and committee assignments, the Court finds that, as of March 24, 1972, plaintiff was not suffering from sex discrimination in the assignment of courses and committees. Both before and after Dr. Ellis became Department head in the Fall of 1970, plaintiff made several complaints concerning her course and committee assignments. In response to these complaints, Dr. Ellis endeavored to accommodate plaintiff's requests to the extent that they were compatible with the needs of the Department and the capabilities of other faculty members. Plaintiff has failed to show that sex discrimination affected these assignments in any manner.

### Graduate Assistants, Research Grants and Travel Allowances

██ The allegations in the complaint concerning graduate assistants, research grants and travel allowances all refer to time periods that ended before March 24, 1972. They, therefore, allege discrimination that is not cognizable under Title VII. Even assuming, however, that plaintiff intended to allege continuing violations, the Court finds that there was no sex discrimination concerning any of these matters that continued beyond March 24, 1972. In the Spring of 1972, plaintiff had one graduate student to assist her in presenting three courses with a total enrollment of 68 students. In comparison, Dr. Hirzel, a male associate professor, had one graduate assistant for three courses with a total enrollment of 519 students. Since a professor's need for graduate assistants is determined primarily by the number of students assigned to his courses, the Court finds that in the Spring Semester of 1972, defendant did not discriminate against plaintiff in assigning graduate students.

Similarly, there is no evidence indicating any denial of University sponsorship of research applications after March 1972. After Dr. Ellis became head of the Department in the Fall of 1970, he acted upon plaintiff's complaints and explicitly ordered that she should receive full departmental support for her research proposals. Plaintiff failed to prove that the Department did not comply with this order. Moreover, other evidence substantiated the defendant's contention that there was never any ban on University support for research applications.

Finally, the Court finds that defendant did not discriminate against plaintiff in the allowance of travel funds. At the time plaintiff allegedly was denied travel funds in 1969 and 1970, there was a University-wide ban on out-of-state travel funds for both men and women. Furthermore, there is no evidence that plaintiff was denied travel funds on a discriminatory basis after March 24, 1972.

Therefore, plaintiff has not established any basis for relief under Title VII.

### THE SECTION 1983 CLAIM

██ Having decided the Title VII claim, the Court's remaining responsibility concerns the equitable relief of back pay and promotion under section 1983. Although the jury returned a verdict for the individual defendants concerning liability for compensatory and punitive damages, that verdict does not necessarily preclude the awarding of equitable relief. Under section 1983 plaintiff alleges: (1) that defendants violated her right to equal protection of the

laws under the fourteenth amendment by intentionally discriminating against her on the basis of sex; (2) that defendants violated her right to freedom of speech under the first amendment by retaliating against her for her public allegations of sex discrimination; and (3) that defendants violated her right to substantive due process under the fourteenth amendment by acting arbitrarily and capriciously in making employment decisions affecting her. For the same reasons that the Court found no unintentional discrimination under Title VII, it now finds no intentional discrimination in violation of the fourteenth amendment.

Similarly, the Court believes that the same reasons that justified defendants' employment decisions and refuted the allegations of sex discrimination also refute the allegation that the actions were taken to retaliate against plaintiff for her public complaints of sex discrimination. The evidence is clear and convincing that the only reasons for defendants' employment decisions affecting plaintiff were the legitimate reasons that they gave in explanation of their decisions.

Finally, plaintiff has failed to prove that defendants acted arbitrarily and capriciously. The Court finds that the criteria and procedures used by defendants in making their employment decisions were reasonable and rationally related to those decisions. In addition, the Court finds that defendants applied the criteria rationally.

For the foregoing reasons, the Court will enter a judgment for defendants in accordance with this opinion.