Leslie CITRON, Plaintiff,

v.

JACKSON STATE UNIVERSITY et al., Defendants.

Civ. A. No. J76–297(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

Oct. 7, 1977.

Jean D. Muirhead, Jackson, Miss., for plaintiff.

A. F. Summer, Atty. Gen., State of Miss., Ed Davis Noble, Jr., Sp. Asst. Atty., Gen., State of Miss., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

The plaintiff, Leslie Citron, a former Assistant Professor of History at Jackson State University (JSU) filed a Complaint pursuant to 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, alleging that his employment by JSU was unlawfully terminated because of his race, religion, and national origin. Citron alleges discrimination by the institution in the terms and conditions of his employment, including academic tenure, promotion, teaching assignments, salary and job benefits. He also charges retaliation against him by JSU in the form of denial of tenure as a result of the filing of a charge of discrimination with the Equal Employment Opportunity Commission. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343(3) and (4).

The case proceeded to trial before the Court without a jury, and this Memorandum Opinion represents the Court's findings of fact and conclusions of law on the issues raised by this action.

### FACTUAL BACKGROUND

The plaintiff is a white, male, naturalized citizen of the United States whose Rumanian name has been anglicized from Vasile Citron to Lasley Citron and Leslie Citron. He received his early education in his native Rumania, and in 1957 received a University diploma from the Victor Babes University, Cluj, Rumania, subsequently earning a diploma in History from that institution, which is comparable to a M.A. degree in the United States.

The plaintiff taught history, primarily Roman history, for six years at the University in Cluj, and worked three years toward his doctorate at that university. After coming to America Mr. Citron took three graduate courses in European History at Boston College and then enrolled at the University of Chicago, where he received a second M.A. Degree in Modern European History. At the end of this period the plaintiff made an application to JSU for employment.

The Board of Trustees of State Institutions of Higher Learning is a constitutional body and the governing authority of the university system of the State of Mississippi. § 213–A, *Constitution of* 1890, as amended; § 37–125–1, *et seq., Mississippi Code of* 1972. The individual defendants were at all times serving in the following official capacities: Dr. R. C. Cook as President of the Board of Trustees; Boswell Stevens, Melton E. Brister, Bobby L. Chain, Dr. Robert H. Harrison, Verner S. Holmes, Charles C. Jacobs, Jr., Dr. John R. Lovelace, Travis E. Parker, W. M. Shoemaker, Mrs. Miriam Q. Simmons, Mrs. Betty A. Williams, and Robert L. Shemwell, Jr., as members of the Board of Trustees; Dr. E. E. Thrash as Executive Secretary and Director of the Board of Trustees; and Dr. John A. Peoples, Jr., as President of the University. As previously stated, they are sued in their official capacities only, and at all times each defendant was acting under color of laws, customs and authority of the State of Mississippi.

The university has established general criteria and procedures governing the promotion of faculty, including formal education, professional experience, teaching effectiveness, scholarly activities, service to the college, and community services. JSU follows the tenure policy of the Board of Trustees, which at the time of the plaintiff's employment required a professor to teach five years without interruption as a prerequisite for tenure. According to the testimony given by Mr. Citron in his deposition and at the trial, he understood the university regulations with respect to employment, promotion and tenure. By his own admission, no regulation, rule or policy of JSU or any representation made by anyone in authority at JSU led Citron to believe that he would automatically receive tenure or to believe he had a valid expectation of continued employment during or after his probationary period. At any rate, even if Citron had been under such an impression it would have been merely a subjective assumption on his part without

any basis in fact. Citron's contract, as are all faculty contracts at JSU, was issued for one year, in line with the general practice regardless of rank or tenure status.

The Tenure Review Committee uses different criteria than that used in promotion matters, including teaching performance, training and experience, student counseling, university services, professional activities, and research and publications. (Exh. P–6). After a tenure hearing, the Review Committee submits a recommendation to the Dean of the Applicant's School, who in turn submits a recommendation to the Vice President for Academic Affairs. This latter official reports to the President of the University, who has the ultimate responsibility for all tenure decisions.

Citron accepted the position of Assistant Professor of History at JSU, beginning in September, 1970, with a starting salary of $10,080. A letter dated January 27, 1970, from Dr. Estus Smith, then Associate Dean of the School of Liberal Studies, (Exh. P–7, p. 91) indicates that Dr. Smith recommended hiring the plaintiff, at which time Dr. Smith thought Citron was a Ph.D. candidate. Citron was given the rank of Assistant Professor, rather than the lowest rank of Instructor as other M.A.'s often received, on the basis of Smith's belief Citron would soon receive a Ph.D. degree.

JSU has historically been and remains a predominately Black university although great strides in integrating the faculty have been made since Dr. John Peoples became President. Over 28% of the faculty at JSU are non-Black, with a substantial number of foreign or foreign-born individuals on the faculty. However in the History Department the non-Black percentage is much higher, and during the years Citron taught in that department the racial composition of the faculty varied from being close to equally divided between Blacks and Whites to having a majority of Blacks. In 1973 there were 10 Blacks and 9 Whites teaching in the History Department; in 1974 there were 12 Blacks and 8 Whites; in 1975, 13 Blacks and 7 Whites; and presently there are about an equal number of Blacks and Whites teaching therein.

Several unpleasant incidents occurred between Citron and his colleagues at JSU, particularly, Mr. Ezzat Slaieh, a fellow history teacher who was of Palestinian descent. Citron clashed with Slaieh several times in debates over political topics, notably the Israeli-Arab situation in the Mideast. Dr. Reeves testified he had often observed Citron pursue Slaieh into the latter's office to continue a heated debate, and that this conduct caused much disturbance in the department. On one occasion when Slaieh was to speak at a seminar at Millsaps College concerning the Mideast political situation, Citron went to the conference and interrupted Slaieh's presentation. After this conference Citron went to Dr. Reeves and told him Slaieh was "an idiot" and had to be stopped from speaking.

On another occasion an incident occurred between Citron and two other colleagues. The plaintiff had ten students in his office which he shared with two other teachers, and according to Citron, when his colleagues entered their office they began in "a sharp tone to scold" him for having so many students in the office. Citron wrote a letter about this incident to Dr. Reeves asking for a chance to air his complaint at a Department meeting, and though the incident went no further, Dr. Reeves said this caused much disturbance in the department.

At the beginning of each of the five years of the probationary period, Mr. Citron received correspondence from the administration notifying him that he had completed another year of employment and should continue to maintain a file of achievements in the event that these records might be ultimately utilized to justify the granting of tenure. Despite this admonition, the plaintiff's file contained very little to reflect his activities during the period from 1970 to the date of the tenure hearing. The only evaluation on file is Dr. Robert Walker dated February 9, 1973, during the period that he was serving as interim department head, which stated that the plaintiff's class preparation was adequate. Throughout this period the administration was anxious

for Citron to obtain his Ph.D. degree, yet in a letter to Dr. Smith dated February 22, 1973, the plaintiff wrote: "I must confess I have done little in my advance toward the Ph.D. degree." (Exh. P–1, p. 87). In addition, during this time the plaintiff never supplied the university with his official transcripts, despite several requests that he do so.

On February 14, 1975, Citron received a letter from Dr. Smith telling him that he was eligible to appear before the tenure committee on April 18, 1975, and that his Department Head would submit Citron's faculty folder to the committee members twenty-four hours before Citron's appearance. (Exh. P–5). He was also advised to review the contents of the folder, which he knew should contain all available favorable evidence. An evaluation letter dated April 18, 1975, the date of the tenure hearing, from Dr. Reeves to Dr. Robert Smith, Dean of the School of Liberal Studies based upon the writer's personal knowledge and interviews with Citron's peers and students, stated six problems Reeves had with Citron: (1) serious communication problem; (2) negative attitude toward colleagues and students; (3) chronic complaining, (4) no professional growth in terms of publications and attendance at professional meetings; (5) no university or community involvement; and (6) personal prejudices which created an unwholesome atmosphere in the history department. Reeves asked for time to work with Citron to correct these problems. This letter was in the plaintiff's file when he received it.

The day after the Tenure Committee hearing of April 18, 1975, Citron went to the American Civil Liberties Union, who referred him to the EEOC (Deposition p. 66). The date of the alleged violation in the EEOC charge is 4–11–75, which Citron says was a mistake, and the Charge of Discrimination is signed by Citron and dated May 6, 1975, (Exh. P–1, p. 81), while another Charge of Discrimination is dated May 19, 1975. (Exh. P–1, p. 78). The charges themselves were received by JSU on May 22, 1975 when a copy was delivered to Dr. Smith (Exh. P–1, p. 75), though notice of the charge was received on May 16, 1975.

On May 20, 1975, Dr. Smith handed the plaintiff a letter from Dr. Peoples which stated that if Citron accepted employment for the 1975–76 academic year it would be under a terminal contract, that the decision was based on Dr. Smith's recommendation which indicated a general inability as a teacher and a lack of effort for professional improvement, and informed Citron of his right to a hearing. He accepted the terminal contract and left for Europe in May, 1975. Subsequently, at the request of the Tenure Committee, Dr. Reeves embodied the basis for the Tenure Committee's decision in a letter dated June 17, 1975, (Exh. P–1, p. 72), and these same objections to granting tenure to Citron were put in a letter of September 16, 1975 from Dr. Smith to Dr. Lee Williams, Vice President for Administration. (Exh. P–1, p. 69).

The Faculty Personnel Committee met to review Mr. Citron's case on October 30, 1975, and again on November 6, 1975, and in the report dated January 30, 1976, decided to recommend that the University retain its position on denial of tenure, but reverse its position on the terminal contract and extend the probationary period. (Exh. P–8). However Dr. Peoples chose to disregard this recommendation and he wrote Citron on February 4, 1976, stating that his decision to terminate Citron was unchanged and that he would be terminated as of May 22, 1976. As a result of this final decision Citron was terminated, and has since that time prosecuted this EEOC claim.

## CONCLUSIONS OF LAW

This teacher termination case is different from most in that the plaintiff Citron has not alleged that the defendant's refusal to grant him tenure was motivated by the plaintiff's exercise of his rights of free speech and association secured to him by the First and Fourteenth Amendments of the United States Constitution. The plaintiff's charge herein is discrimination, and therefore the Court's task is limited to determining whether he was refused tenure

and given a terminal contract for discriminatory reasons.

In spite of this state of his pleadings, the plaintiff attempted in his testimony to prove that he had been denied the minimal standards of a procedural due process hearing, to which he claimed entitlement by virtue of a deprivation of a property right and infringement upon a "liberty interest." *Bradford v. Tarrant County Junior College District*, 492 F.2d 133 (5th Cir. 1974). The basic allegation of the existence of such a property right was stated in the complaint thusly: "Plaintiff had a reasonable expectation of re-employment. . . ." However, as the Court noted above in its Findings of Fact, this is a mere subjective assumption on the part of the plaintiff for the reasons noted previously, and without question Citron was a probationary employee. In this setting the question arises as to when and under what circumstances does a public employee establish a property right. In *Russell v. El Paso Independent School District*, 539 F.2d 563, 565 (5th Cir. 1976), the Court of Appeals refused to accept assumptions, presumptions or personal claims as a basis for vesting property interest:

"As we said in *Roane v. Callisburg Independent School District*, 511 F.2d 633 (5th Cir. 1975):

To merit due process protections a person must have more than an 'abstract desire' or even a compelling personal need for the interest in question; he must be able to establish a 'legitimate claim of entitlement to it.' . . . Thus, the mere failure to rehire an employee without restricting his opportunity to search for other employment does not reach constitutional proportions. . . Moreover, the test is necessarily objective. That Roane himself had a unilateral 'expectancy' of continued employment is not determinative absent reasonable indicia of a school board policy or understanding."

And in *Burnley v. Thompson*, 5 Cir. 1975, 524 F.2d 1233, 1240, the same Court had this to say about a probationary teacher:

"The Supreme Court has now firmly established that a probationary teacher or federal employee, who has no reasonable expectation of continued employment while in the probationary status, has no property interest in his or her continued employment sufficient to call forth procedural due process when that employment is terminated. *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). See also *Ring v. Schlesinger*, 1974, 164 U.S. App.D.C. 19, 502 F.2d 479. Cf. *Ferguson v. Thomas*, 5 Cir., 1970, 430 F.2d 852; *Pred v. Board of Public Instruction of Dade County, Fla.*, 5 Cir., 1969, 415 F.2d 851."

*Siler v. Brady Independent Sch. Dist.*, 5 Cir. 1977, 553 F.2d 385, 387, 388, instructs us where to look for a property right, if any:

"As the Supreme Court recently emphasized in its decision in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), property interests are created by state law, and a court in reviewing whether an individual has been deprived of a property interest must first look to state law to determine if there exists an actual underlying property interest. As Justice Stevens wrote in that case,

A property interest in employment can, of course, be created by ordinance or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law. 426 U.S. at 344, 96 S.Ct. at 2077, 48 L.Ed.2d at 690."

This Court was called upon in *Wood v. University of Southern Mississippi*, 539 F.2d 529 (5th Cir. 1976) to consider tenure matters at a state university. In our unpublished findings of fact and conclusions of law, which the Court of Appeals adopted as part of its opinion, 539 F.2d at 532, we said:

"It is undisputed in this record that the published rules and regulations of the defendant University of which both

plaintiffs were fully aware required five years uninterrupted teaching at the University in order to attain tenure. Also, it was the uniform policy of USM to grant only yearly contracts to teach. Neither of the two plaintiffs was discharged or fired, but their contracts were merely not renewed after their expiration. Neither did either plaintiff have de facto tenure inasmuch as each merely had a subjective expectation of renewal of their contracts, and there was no objective basis for expectation of renewal based on any regulation, written or unwritten policy of the defendant University or any representation made by any one in authority, including the named defendants, which would have required that USM accord them minimal due process prior to their non-renewal. *Board of Regents v. Roth, supra; Perry v. Sindermann, supra; Bradford v. Tarrant County Junior College Dist., supra.*" *Wood,* C.S. No. 73H–96(N), p. 197.

█ Mr. Citron stands in the shoes of the plaintiffs in *Wood.* Although he had been employed at the University for a term of years, there is simply no evidence which shows the existence of any understanding or implied promises of continued employment, and therefore *de facto* tenure does not exist.

With these facts in mind, the plaintiff is placed squarely within the teachings of *Orr v. Trinter,* 444 F.2d 128 (6th Cir. 1974) in which the Court defined non-tenure thusly:

". . . [T]he very reason for the probationary period is to give the Board a chance to evaluate the teacher without making a commitment to rehire him. A non-tenured teacher's interest in knowing the reasons for the non-renewal of his contract and in confronting the Board on those reasons is not sufficient to outweigh the interest of the Board in free and independent action with respect to the employment of probationary teachers. The Board is not a legal tribunal. It is an employer, and when it decides to hire or not to hire a particular teacher, it is acting 'as a proprietor, to manage the internal operation' of the public schools.

*Cafeteria and Restaurant Workers, Local No. 473 v. McElroy, supra,* 367 U.S. 886 at 896, 81 S.Ct. 1743 at 1749, 6 L.Ed.2d 1230. As was stated by Mr. Justice Brennan in his dissent in *Nelson v. Los Angeles County,* 362 U.S. 1, at 16, 80 S.Ct. 527, at 535, 4 L.Ed.2d 494:

" 'Doubtless a probationary employee can constitutionally be discharged without specification of reasons at all; and this Court has not held that it would offend the Due Process Clause, without more, for a State to put its entire civil service on such a basis, if as a matter of internal policy it could stand to do so.' " 444 F.2d 128, 134–135.

*See also Moore v. Otero,* 557 F.2d 435 at 437 (5th Cir. 1977).

It is clear that the plaintiff had not acquired a protectable property interest in expectation of future employment. An abridgement of First Amendment speech or other liberty rights has not been alleged in this section, but since damages to "professional reputation" are claimed in the prayer for relief the Court deems it proper to address this subject, viewing the allegation as a contention that the non-renewal of his teaching contract stigmatized his reputation and foreclosed other employment opportunities.

The landmark case in this area is *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), in which the Court held that a governmental attack upon a person's "good name, reputation, honor and community standing" could be a deprivation of liberty if the person was subjected to public embarrassment and ridicule. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). This principle was affirmed in the area of teacher employment when the Supreme Court held *inter alia* that the plaintiff, a non-tenured instructor whose contract was not renewed, was not denied "liberty" within the meaning of the Fourteenth Amendment since the non-renewal of his contract was not based upon any charge which would seriously damage the plaintiff's community reputation, such as dishonesty or immorali-

**10**

ty. Our own Court of Appeals interpreted this decision, in the case of *Sims v. Fox*, 505 F.2d 857, 863 (5th Cir. 1974) *en banc*, to hold that:

> In brief, *Roth* teaches that the government's attack on one's reputation may infringe constitutionally protected liberty in two respects: (1) governmental degradation of one's standing in his community may be a denial of 'liberty'; (2) governmental communication of derogatory information to employers may be an attack on 'liberty'.

 It is clear that non-renewal itself is not such damage to the teacher's reputation and standing in the community as to amount to a denial of a "liberty" interest, but the plaintiff must prove a more tangible damage. *Cf. LaBorde v. Franklin Parish School Board*, 510 F.2d 590 (5th Cir. 1975). Such a showing is completely absent in this case since it has not been alleged or proved that any of the named defendants committed any overt act to impugn the character of the plaintiff, to damage the plaintiff's reputation in the community, or to prevent the plaintiff from finding other employment. There has been no public disclosure of any information about the plaintiff which might form the basis for a charge of infringement upon a liberty interest. The testimony indicates that the material and the information contained therein were contained in personnel files and kept there in confidence.

 Since we have concluded that the plaintiff was not deprived of a property right or a liberty interest, we now proceed to consider his claimed violations of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e, *et seq.* Section 1981 is a statutory prohibition of all racial discrimination in employment by public or private employers, and is separate from and independent of other remedies such as Title VII of the Civil Rights Act of 1964, or § 1983 and the Fourteenth Amendment. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

The Court concludes that the plaintiff has not been the victim of racial discrimination by the defendant JSU, for reasons set out more fully below, and therefore there is no violation of § 1981.

 Title VII of the Civil Rights Act of 1964 provides that:

> (a) It shall be an unlawful employment practice for an employer—
>
> > (1) to fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . [42 U.S.C. § 2000e–2(a)].

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 668 (1973), the Supreme Court stated that three distinct burdens of proof pertain in a Title VII case. Plaintiff has the initial burden of establishing a prima facie case by showing that: (1) he is a member of a protected class; (2) he applied for and was qualified for a position for which his employer was seeking applicants; (3) despite his qualifications he was rejected; and (4) thereafter the position remained open and the employer continued to seek applicants with plaintiff's qualifications. The Court in that case recognized that in the various contexts in which Title VII cases arise, the *prima facie* requirements would vary in the different factual settings. The message is clear, however, that though the *McDonnell Douglas* pattern is not the only means of establishing a *prima facie* case of discrimination, the general principle is that any Title VII plaintiff must carry the initial burden of offering enough evidence to create the inference that the employment decision was based on discriminatory criterion. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). If the plaintiff does so, the burden shifts to the defendant to show a legitimate non-discriminatory reason for the employee's rejection. The case at bar is such a different factual setting and the

plaintiff's burden here, based upon the statements found in his charge of discrimination, was to show disparate treatment in the various areas of the allegations due to his race, national origin, or religion.

█ Viewing the plaintiff's allegations in this context, the Court finds that the plaintiff has failed to demonstrate any *prima facie* showing of discrimination which would shift the burden to the defendants to show a legitimate purpose for the failure to promote the plaintiff, the denial of tenure, and the terminal contract. However, even if the Court assumes that the plaintiff has made such a showing, in every area the defendants have proved by a legitimate, non-discriminatory reason for the decisions made in the plaintiff's employment status.

The Complaint states that the plaintiff has been discriminated against on the basis of his race, national origin, and religion, which are, respectively White, Rumanian and Jewish, as opposed to other faculty members with equivalent or lesser qualifications and experience. Specifically, the plaintiff charges that the alleged discrimination took the form of: denying the plaintiff summer teaching positions, denying him teaching assignments in the graduate school, unequal salary increments, and a failure to maintain a working environment for him free of discriminatory insult and harassment. Citron states that all these conditions culminated in his charge with the EEOC, and in retaliation for this charge that he was denied tenure and given a terminal contract.

## A. *Summer Teaching Positions*

Citron states that he received discriminatory treatment in the distribution of summer teaching opportunities, a job teachers generally desired for extra income. His own testimony establishes that he asked for summer teaching in 1971 and got it; he did not ask in 1972 because of European travel; in 1973 he asked for it and got it; in 1974 and 1975 he asked for summer work and did not receive it. Plaintiff testified that others in the department always received such assignments, and this is all the evidence the

plaintiff offered on the subject. On the other hand, Dr. Bennie L. Reeves, head of the History Department since June, 1973, testified that summer work was directly contingent upon student interest in the subject matter and thus on the numbers of students who enroll; and often not enough students attend summer sessions to enable all teachers who wanted summer work to get it, since support for summer classes is dependent on student fees. This witness denied that Citron was not given summer teaching jobs because of discrimination, but because of, as the plaintiff himself stated in his deposition, "no money, no students, dropping interest in the summer session." The Court finds this testimony ample proof of a legitimate reason for the plaintiff's failure to obtain his desired summer work.

## B. *Graduate School Teaching Assignments*

Mr. Citron alleges he was denied the opportunity to teach in the graduate school, which he was qualified for and that others with less qualifications did teach in that school. Again the Court feels that the only proof on the subject, the testimony of the plaintiff himself, was not sufficient to establish discrimination as the reason for no graduate school teaching assignments. Though two other faculty members with M.A.'s did teach in the graduate school on occasion while the plaintiff did not, his opinion of their qualifications was mere subjective observation, and was refuted by the testimony of the defendants' witnesses. Dr. Reeves testified he did not refuse the plaintiff the opportunity to teach in the graduate school for any personal reason, but that these positions were granted on the basis of academic training, which the plaintiff had no transcripts to prove, the basis of a specialty in a particular field, which the plaintiff had not demonstrated, and the course to be taught must already be in the curriculum. In regard to this last factor, Reeves said the plaintiff would always ask to teach courses which did not exist, such as the History of Nationalism, History of Racism, and Ancient History. If a course was not in the graduate school

curriculum the interested party would need to present course outlines and other information to the Curriculum Committee for the course to be included, yet the plaintiff never did this and thus received no graduate school teaching assignments. This Court finds Reeves' testimony on this point clear and convincing that the plaintiff was not discriminated against in this area.

In the same general area of teaching assignments, though not mentioned in the Complaint, the plaintiff testified at length that he was discriminated against by being given a disproportionate load of freshman courses to teach, such as Western Civilization, while Black faculty members were permitted to refuse these teaching assignments. Reeves said this was not true, that all teachers had to teach these courses, and went on to note that a class required ten students to "make", and that the plaintiff's upper level courses invariably did not attract enough students to cause the course to "make" or be actually taught, thus special permission was always required for their continued existence. Determinations of course assignments involve the exercise of the department head's professional judgment concerning the needs of the department and the capabilities of the available faculty. Therefore, the members of the faculty must be willing to adapt their schedules to conform with the needs of the department and the capabilities of the other faculty members. No faculty member has a vested right to teach any course he so desires. Again the defendants have proved by a preponderance of the evidence that discrimination played any part in these assignments.

## C. *Salary Discrimination*

The plaintiff charges he did not receive the salary raises that black teachers with similar qualifications were given. The following is a salary schedule for Leslie Citron during his years at Jackson State:

| | |
|---|---|
| 9/1/70 – 5/31/71 | $10,080 |
| 9/1/71 – 5/31/72 | 10,440 |
| 9/1/72 – 5/31/73 | 10,800 |
| 9/1/73 – 5/31/74 | 10,800 |
| 9/1/74 – 5/31/75 | 11,160 |
| 8/25/75– 5/22/76 | 12,650 |

(Pretrial Order).

As noted above, the plaintiff presented no official transcripts to the University Administration until February, 1977, which would constitute the only real proof of academic accomplishments. Dr. Smith had repeatedly asked the plaintiff for these transcripts, and his failure to produce them over such a long period of time had raised doubts in the University administration's mind about the validity of the plaintiff's self-described academic qualifications. Dr. Smith testified that he thought the 1973–1974 salary action would prompt the plaintiff to either honor the repeated requests for transcripts or to actually achieve the Ph.D. degree, since Citron had been hired as a Ph.D. candidate and paid an appropriate initial salary at that grade. His failure to register any progress toward that degree prompted Reeves and Smith to feel that he had not earned a raise after the 1972–73 academic year. These officials made a determination that the plaintiff must from that time be considered a faculty member possessing a Master's degree only during his entire employment. Most of Citron's colleagues who were not Ph.D.'s upon initial employment were making substantial progress toward that degree during this period, and although Citron was participating in the doctoral program at Mississippi State University, this fact was not known until the tenure hearing in 1975, a full year after the pay period in which he received no raise.

Although we have found that the plaintiff has not made a prima facie case of discrimination in this pay area, assuming *arguendo* that he has, Drs. Smith and Reeves presented detailed testimony which more than proved by a preponderance of the evidence a legitimate, non-discriminatory reason for determining Citron's salary. A list of salaries for the History Department personnel reflects that at all times Citron was receiving a salary comparable to that received by other assistant professors with M.A. degrees and at the trial Dr. Smith went over every faculty member's

salary, giving ample justification for every figure. Based on this testimony we find that the defendants have proved by a preponderance of the evidence a legitimate, non-discriminatory basis or reason for the plaintiff's salary determination, and that Mr. Citron has not proved that it was a pretext for discrimination against him.

### D. *Working Environment*

The complaint also charged the University with failure to furnish a working environment free of discrimination and intimidation. Mr. Citron did not elicit a single, direct instance of racial, religious or national prejudice on the part of any defendant. He could point to no instance, either in his deposition or at the trial, of such action on the part of Dr. Peoples, and, in fact, Dr. Peoples testified he hardly knew the plaintiff, having seen him on perhaps two occasions. Every witness who testified emphatically stated he had not harassed, intimidated, or in any way maligned the plaintiff because of the plaintiff's race, religion or national origin. The record is completely devoid of any evidence on this point, except for Mr. Citron's allegations, and the Court finds the testimony of every other witness convincing that these charges are not true and were only a product of Mr. Citron's sensitivity. Therefore, the plaintiff has failed to prove this particular allegation by a preponderance of the evidence.

### E. *Promotion*

The factors used in promotion criteria have been identified previously as formal education, professional experience, teaching effectiveness, scholarly activities, service to the college and community services. The JSU Faculty Handbook states "Evidence of attainment of formal education and professional experience is determined through official credentials. The remaining factors are evaluated by means of an objective rating procedure developed by the Faculty Personnel Committee. The Department Heads, Division Chairman and School Deans are responsible for carrying out this rating procedure."

It is obvious the plaintiff could not pass muster under the first two factors since he had supplied the University with no official credentials. Drs. Smith and Reeves testified that invariably the plaintiff's classes did not attract the minimum number of students necessary, an adverse indication of teaching effectiveness. Citron had produced no scholarly works in this period though several publications were produced at the trial to show the other JSU faculty's output of publications. As far as service to the college is concerned, Mr. Citron served on two faculty committees, one after his letter of non-renewal was issued, and there was no evidence of a single act of community service performed by the plaintiff over this long period.

■ Our attitude in this area was correctly stated in the case of *Cussler v. University of Maryland,* 430 F.Supp. 602 (D.C. Md.1977), when that Court said:

As the courts repeatedly have noted, promotion decisions in academia necessarily involve matters of professional judgment. (authorities omitted). The courts are, therefore, reluctant to substitute their judgment for the judgment of academics with expertise in their respective fields. *Green v. Board of Regents of Texas Tech University,* 335 F.Supp. 249, 250 (N.D. Tex.1971), *aff'd* 474 F.2d 594 (5th Cir. 1973) (430 F.Supp. at 605)

■ With this rule in mind and given the facts of the case, the Court finds from a preponderance of the evidence that JSU's decision not to promote Citron was based on legitimate non-discriminatory reasons.

### F. *The Denial of Tenure*

The Tenure Review Committee met on April 18, 1975, and allegedly displayed a "hostile" attitude toward the plaintiff; however, the only basis for this allegation is the testimony of Mr. Citron, contradicted by that of Drs. Smith and Reeves that there was nothing abnormal about the manner in which the tenure hearing was held except for the fact that Citron chose to take the hearing as an opportunity to continue his

chronic complaints about treatment in the areas covered previously rather than to present evidence of his academic advancement and achievements. These witnesses testified that Citron spent most of his time before the Tenure Review Committee complaining about Ezzat Slaieh, the fact Citron had not been assigned to teach in the graduate school, and insisted on arguing about past controversies. Dr. Reeves testified that when Citron was asked about his professional activities, he replied that he had participated like everybody else. The plaintiff made no effort at the tenure hearing to demonstrate accomplishment in the context of the tenure guidelines in order to prove that he had earned tenure.

The Tenure Review Committee, headed by Dr. Robert Smith, recommended that the plaintiff be denied tenure, and forwarded this recommendation to Dr. Peoples. On May 20, Citron received a letter from Peoples that stated Citron would be given a terminal contract because of a "general inability as a teacher and the lack of effort on your part for professional improvement." (Exh. P–6). Later that summer following the tenure hearing, Dr. Reeves embodied the committee's findings in a letter to Dr. Smith, and stated these reasons for the committee's recommendation:

1. Citron's assigned upper level courses never attracted enough students to materialize and Citron was unwilling to teach only freshmen level courses.
2. Citron has shown no professional growth in terms of attendance of professional association meetings relating to his field.
3. Citron has shown no evidence of professional growth in terms of publications or research.
4. Citron has not provided course outlines for his courses.
5. Citron has not sufficiently involved himself in JSU affairs such as seminars, assemblies and convocations.
6. Citron is a constant complainer about the situation at JSU and is never satisfied with his teaching duties at JSU.
7. Citron has allowed his personal prejudices to enter his classroom provoking complaints from students to the department head and fellow faculty members.
8. Dozens of students have complained about his teaching ineffectiveness.

As noted above, the Faculty Personnel Committee met on October 30, 1975 and considered the charges against Citron, embodying their findings in a report to Dr. Peoples dated January 30, 1976. In that report the Committee found that the evidence substantiated the fact that Citron's upper level courses did not attract students; that he had shown no professional growth in terms of publications, research and attendance at professional meetings relating to his field; and that he had not sufficiently involved himself in JSU affairs or activities; that Citron was a constant complainer. This Committee found that the other charges were not substantiated and recommended to President Peoples that Citron not be given tenure but be given an additional probationary year.

■ With this evidence of the plaintiff's tenure denial before the Court we are now asked by him to find that he was denied tenure because of discriminatory reasons. At the outset, the Court recognizes that it is not sitting as a reviewing body of the correctness or incorrectness of Dr. Peoples' decision to withhold tenure, since federal courts should be loathe to intrude into internal school affairs. *Megill v. Board of Regents of State of Florida,* 541 F.2d 1073 (5th Cir. 1976); *Blunt v. Marion County School Bd.,* 515 F.2d 951 (5th Cir. 1975).

The Supreme Court has held in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) that a state may grant or withhold tenure at its unfettered discretion. The Fifth Circuit applied the *Bishop* Rule in *Megill, supra,* and declared that:

As far as the federal court is concerned, the state could deny tenure to the plaintiff for no reason, a reason based on erroneous facts, or for any reason it chose, except for a reason that violated the plaintiff's constitutional rights. The

federal court's only function in such a case is to decide the merits of plaintiff's constitutional claims. As this Court held in *Ferguson v. Thomas,* 430 F.2d 852, 857 (5th Cir. 1970), a teacher may neither be dismissed nor denied rehiring for constitutionally impermissible reasons, such as race, religion, or the assertion of constitutional rights. 541 F.2d at 1077.

In summary then, the ultimate question before this Court is whether the impermissible factors of race, religion, or national origin were the basis of the decision not to grant Mr. Citron tenure, and the Court must make this decision only if the plaintiff has met his *McDonnell Douglas* burden of going forward with his proof and making out a prima facie case.

In the instant case the plaintiff has proved only that he was denied tenure, and has not put forth the first piece of evidence to prove he was denied tenure for the constitutionally impermissible reasons alleged. The only evidence before the Court which even suggests such a conclusion is the testimony of Citron himself, and that evidence consists only of his theory that since in his opinion he was a good, qualified teacher and was not granted tenure, it must have been because he was White, Jewish and born in Rumania.

On the other hand, and assuming *arguendo* that Citron has produced evidence which establishes a *prima facie* showing discriminatory factors entered into the decision in his case, the Court is faced with overwhelming evidence that Citron's superiors, as well as his peers and colleagues, felt that Citron should not be granted tenure for perfectly valid academic reasons, as reflected by the finding of the Faculty Review Committee.

From the time Citron was hired by Jackson State until the time he received his terminal contract, he did not supply the university with official transcripts to verify his academic qualifications despite repeated requests therefor. To compound this deficiency, the plaintiff was hired under the impression that he was a candidate for the Ph.D. degree, but in his five year probationary period he, by his own admission, made little progress toward that degree. The evidence is overwhelming that all of the administrators familiar with Mr. Citron's case were very anxious that he obtain his Ph.D. degree, and his failure to do so after such a lengthy delay could only adversely affect their opinion of his desire for academic and professional improvement. In addition, Citron's failure to earn his terminal degree after his initial representations naturally contributed to the university officials' concern about his other academic qualifications, which could only be laid to rest by the official transcripts which were never forthcoming. In his five years at JSU he published no articles, produced no scholarly works, received no grants of funds for scholarly research or other academic activities, and in no way improved the History Department. The only notable feature about his teaching ability produced for the Court's scrutiny was the uncontroverted fact that his classes never attracted enough students to meet the minimum number required for a class. In all his years at JSU the only activity he could claim in university affairs was membership on two committees, one of which began after tenure was denied. The plaintiff was enrolled in the Ph.D. program at Mississippi State University, but this was "news" to most of the university officials who should have been informed of this activity, and official proof of this fact was only received after the tenure decision. Thus the same reasons which justified the defendants' promotion decision apply to the plaintiff's tenure application. Dr. Estus Smith testified that Citron had displayed a lack of involvement in university affairs, and stated the activities of each member of the faculty in the History Department in 1974–75 in university affairs. Smith also stated that Citron had voiced a low opinion of JSU and other state universities when asked why he did not attempt to earn his Ph.D. degree in a state institution, i. e., the plaintiff felt that no state institution had enough prestige to make the Ph.D. degree from that institution worthwhile.

Citron felt that a person of his academic qualifications should teach only upper level, and not freshman, courses, complaining to Dr. Smith when he had to teach the latter "service" courses, in spite of the fact that he was unable to attract history majors to enroll in his upper level courses. Citron's personal animosity toward Slaieh which created an unwholesome atmosphere in the department has already been discussed. Drs. Smith and Reeves went down the list of the faculty in the History Department and related each person's achievements, qualifications and contributions to the university community, both by those faculty members tenured and non-tenured. In addition, the defendants produced documents and catalogues which listed the publications, grants, and other scholarly activity of the entire JSU faculty, none of which contained the plaintiff's name, although some of his colleagues in the History Department were named.

■ In summary, the Court accepts the testimony of Drs. Smith and Reeves and finds that the defendants have proved by a preponderance of the evidence that Mr. Citron was denied tenure for valid academic reasons, and the plaintiff has not proved by a preponderance of the evidence that the employers' above reasons was a pretext for discrimination.

G. *The Retaliation Charge*

■ This Court rejects the plaintiff's contention that the non-renewal of his contract was in retaliation for his filing the EEOC charge. While it is true that the notice of the charges was received by JSU on May 16, 1975, four days prior to the date of the non-renewal letter from Dr. Peoples, the decision to issue Citron a terminal contract was not motivated by these charges. President Peoples testified very emphatically that prior to May 16, the date of receipt of the notice, he had already made the decision not to grant the plaintiff tenure and to issue him a terminal contract; that he had in his possession prior to May 16 two letters, one from Dr. Reeves to Dr. Robert Smith, and one from Dr. Robert Smith to

Dr. Estus Smith, both of which recommended the denial of tenure and termination of the plaintiff. Additionally, Dr. Estus Smith had already made the same recommendation to Dr. Peoples prior to May 16. Most importantly, Dr. Peoples' office had not received and he had not seen the charges until after the letter to Citron had gone out. Dr. Smith testified that he received the charges on May 22, 1975, and this coincides with the testimony of Dr. Peoples that the charges in question had been stamped received on May 16 but had been elsewhere in the administrative structure, not arriving in his office or in his possession until May 22, 1975. In any event, it is clear the plaintiff was being terminated in spite of the EEOC charge. In *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) the Supreme Court dealt with a non-tenured teacher and First Amendment allegations, and held that even if protected conduct is found to have played a "substantial part" in the school board's decision not to renew the teacher's contract, the non-renewal would not amount to a constitutional violation if the Board, in fact, would have reached the same decision in any event. Here we conclude that Citron was not going to be rehired even if his EEOC charges were not filed.

In conclusion, we find that the defendants have proved by a preponderance of the evidence that the plaintiff's termination at Jackson State University was for non-discriminatory, legitimate reasons. Sound academic reasons dictated the decision not to grant Citron tenure. The plaintiff has failed to prove by a preponderance of the evidence that these reasons articulated and proved by the defendants were pretexts for discrimination against the plaintiff for any of the reasons in any of the actions alleged, and therefore the plaintiff is entitled to no relief against the defendants under 42 U.S.C. § 2000e or under 42 U.S.C. § 1981. The criteria and procedures used by the defendants in making their employment decisions were reasonable and rationally related to those decisions.

An Order conforming with the foregoing Memorandum Opinion, approved as to form by attorneys for all parties, shall be submitted to the Court within the time and in the manner prescribed by the Local Rules.