# United States Court of Appeals
## For the First Circuit

No. 08-1043

MARA SABINSON,

Plaintiff, Appellant,

v.

TRUSTEES OF DARTMOUTH COLLEGE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before
Torruella, Boudin and Dyk,[*]
Circuit Judges.

K. William Clauson with whom Clauson Atwood & Spaneas was on brief for appellant.
Bruce W. Felmly with whom Linda S. Johnson, Michael T. Pearson and McLane, Graf, Raulerson & Middleton, P.A. were on brief for appellee.

September 12, 2008

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN**, **Circuit Judge**. Professor Mara Sabinson challenges the district court's grant of summary judgment to her employer, Dartmouth College, on her claims under Title VII, 42 U.S.C. § 2000e (2000) et seq., under the federal age discrimination statute, 29 U.S.C. § 621 (2000) et seq., and for retaliation. We review the grant of summary judgment de novo, drawing inferences in favor of the nonmoving party, here Sabinson. Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 39 n.1 (1st Cir. 2002).

The background facts, elaborated in the district court's decision, Sabinson v. Trustees of Dartmouth Coll., No. 05-cv-424-SM, 2007 WL 4191943, at *2-*5 (D.N.H. Nov. 21, 2007), can be summarized briefly. Mara Sabinson is a professor in the Dartmouth College Theater Department. She first visited the department in 1984, was hired in 1985 and has been tenured since 1991. Her difficulties there date back at least to 1988, when she almost was not reappointed to her pre-tenure position due to concerns about her interactions with students and faculty. Her subsequent tenure battle was contentious.

Sabinson served as chair of the Theater Department in seven non-consecutive years, most recently from 1999 to 2002. During that time, some of her colleagues and students complained to school administrators about her behavior toward them. One of these administrators, then-Dean of the Faculty Edward Berger, wrote her

-2-

a critical letter in June 2001, asserting that her department was "demoralized" and that she had generated a "high level of acrimony" amongst the faculty.

Despite such criticisms, a number of Sabinson's student evaluations for both teaching and directing were positive, and peer reviews of the productions she directed were favorable. Some faculty members who worked in the department in the past seem to have gotten along well with her. Overall, there is evidence she was a good teacher and director and other evidence suggesting that her style of interacting with others, both students and faculty, was controversial.

Sabinson's appointment as chair ended in 2002 and she left on a year-long sabbatical. Lenore Grenoble, Associate Dean of the Faculty for the Humanities, concluded that the Theater Department was in disrepair and needed to be placed in "receivership" due to the various student and faculty complaints and the generally contentious atmosphere. Dean Grenoble took over as chair and, when Sabinson returned in fall 2003, assigned Sabinson's usual advanced acting class to a different professor; in fall 2004, Dean Grenoble also reassigned the job (previously Sabinson's) of directing the 2005-2006 main stage production.

That same fall, Dean Grenoble determined that an intensive review of the Theater Department was required to get it back on track. She selected three reviewers: Peter Saccio, Leon

D. Black Professor of Shakespearean Studies at Dartmouth; Malcolm Morrison, Dean of the Hartt School of Music at the University of Hartford; and Anne Torsiglieri, a professional actress. The review committee was charged with a review of the department that encompassed its acting program.

The review committee met on campus on April 25 and 26, 2005. After conducting interviews and completing its review, the committee compiled an extensive report detailing a number of challenges facing the department. It expressed concern about enrollment and about student attrition and morale, and it made wide-ranging suggestions for changes in the department's operations. There was no specific discussion of Sabinson in the report itself.

However, in a confidential cover letter transmitting the report, the review committee asserted that there had been widespread criticism of Sabinson. It described her effect as "corrosive" and strongly urged that she be offered a retirement package. In the alternative, it said that she should be "marginalized to certain courses" -- apparently to the exclusion of directing. On June 3, 2005, after meeting with the review committee, Dean Grenoble, along with Dean of the Faculty Carol Folt and Provost Barry Scherr, met with Sabinson to discuss the committee's findings, including the options it had proposed.

-4-

Sabinson claims that she was told in this meeting that she did not fit into the "culture" of the department. Sabinson agreed to consider the buyout offer once she was told what course offerings would otherwise be assigned to her. Soon after Sabinson returned to her office, Professor Margaret Spicer, a colleague but also an antagonist of Sabinson, stopped by and, learning of the meeting, suggested that Sabinson "find [her] rabbi and start . . . a happy new life." The reference -- to a play in which the character by Sabinson had done just that -- offended Sabinson.

On June 6, 2005, Sabinson met with Ozzie Harris, then a diversity officer at the college, but she did not file a grievance with him. On August 8, 2005, Sabinson filed a complaint with the Equal Employment Opportunity Commission and the New Hampshire Commission on Human Rights. On August 16, 2005, Dean Grenoble offered Sabinson four courses for the upcoming academic year: Acting for the Camera and three first-year writing seminars on a topic of her choosing.

On November 30, 2005, Sabinson filed suit against Dartmouth in federal district court, alleging wrongful constructive discharge and demotion; breach of contract; discrimination based on age, gender, and religion; and retaliation. On August 29, 2006, the constructive discharge claim was dismissed and on November 21, 2007, the district court granted Dartmouth's motion for summary

judgment as to the remaining discrimination and retaliation claims, declining to exercise pendant jurisdiction over the contract claim. Sabinson now appeals from the grant of summary judgment as to the discrimination and retaliation claims.

In support of her discrimination claims, Sabinson argues that the review committee was a sham designed to find against her in accordance with a plan by Dean Grenoble, who was discriminatory in appointing a biased committee and instructing it improperly, and that the review committee was itself biased. According to Sabinson, Dean Grenoble and the review committee failed to review or recognize her good teaching evaluations and the review committee members never saw her teach. In addition, Dean Grenoble allegedly instructed the committee to make findings critical of Sabinson.

In claiming that material issues of fact precluded summary judgment, Sabinson points to her own affidavit recounting the events just described, an affidavit of Ozzie Harris that he thought she was being unfairly treated, and three affidavits of other professors speaking generally about their perceptions of racism, anti-Semitism, and sexism at Dartmouth. Sabinson also says that the buyout offer evidenced age-based animus and that the decision to assign her to three first-year writing seminars was retaliation for her complaint to the EEOC.

As the district court found, Sabinson offered no <u>direct</u> evidence of religious, gender- or age-based discrimination. The

statements by decision-makers about the "culture" of the department were made in the context of a cover letter referring to antagonism within the faculty and a failure to work together. Cf. Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002) (comments capable of different interpretations are not direct evidence). Ozzie Harris, although sympathetic to Sabinson, agreed that this is all that had been meant.[1]

By contrast, the three affidavits offered some anecdotal evidence of racism, sexism, and anti-Semitism. But they were not directed to any events concerning Sabinson and did not involve the decision-makers in her case during the time period at issue here. See Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 249 (1st Cir. 1997). And the offer of a buyout to resolve an employment dispute is by itself hardly direct evidence of age discrimination even if the employee is elderly. Cf. Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (employment decisions not discriminatory under ADEA if something besides age motives them).

Absent direct evidence of discrimination, the district court appropriately applied the McDonnell Douglas burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

---

[1]Harris, who had left Dartmouth, said in his deposition that he thought men were more generously treated than women on the faculty and that Dartmouth was a Christian school; but he also said that he thought that the review process had been fair, that Grenoble had been fair minded, and that the retirement offer was appropriate.

Even assuming arguendo, as the district court did, that Sabinson made out a prima facie case under this formula -- not a heavy burden, Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) -- Dartmouth has produced a non-discriminatory justification for its action, namely, the review committee's finding that Sabinson's manner was damaging the department.

That conclusion, whether or not correct, accorded with some of the history already recounted. Once such a colorable nondiscriminatory explanation is provided, the burden under McDonnell Douglas shifts back to the plaintiff to show that the motive was discriminatory.[2] The question is whether Sabinson created a jury issue as to whether Dartmouth's explanation was simply a pretext for discrimination. See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842-43 (1st Cir. 1993).

Sabinson contends that the college's reliance on the review committee was pretextual because the committee was not genuinely examining her qualifications, but was rather appointed and taking action merely to provide cover for a predetermined adverse action. If arguable unfairness in treatment were enough,

---

[2]Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000)(after employer offers legitimate nondiscriminatory reason, "the sole remaining issue [is] 'discrimination vel non'") (citation omitted); Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44-45 (1st Cir. 2002) (same); Thomas v. Eastman Kodak, 183 F.3d 38, 56 (1st Cir. 1999) (at the third stage of the McDonnell Douglas framework "the ultimate burden is on the plaintiff to persuade the trier of fact that she has been treated differently because of [a protected characteristic]").

Sabinson might well have a case for a jury. Allegedly, Saccio had a history of enmity toward her; the other two review committee members were friends of Professor Peter Hackett, the new chair of the department, supposedly also hostile to Sabinson; Grenoble, who appointed the review committee and participated in the final ultimatum, already had an unfavorable view of Sabinson. And, it might be a question of fact whether the review committee fairly considered or properly weighed all of the relevant evidence.

But, whether or not personal or professional hostility played a role in the assessment, federal law does not protect generally against arbitrary or unfair treatment in private employment, but only against actions motivated by listed prejudices such as race, age and gender. Hazen Paper Co., 507 U.S. at 609; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 (1st Cir. 1999); Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994). Discrimination is a form of unfairness; but not all unfairness is discrimination.

Even if we were to assume that Sabinson has produced evidence of pretext, the problem is that Sabinson's evidence did not tend to establish a discriminatory purpose, but rather tended to establish that a preexisting animus against her (unrelated to discrimination) was the reason for the adverse action. Thus, in a sense, the existence of personal or professional hostility toward Sabinson based on other reasons tends to work against her claim of

discrimination.  Sabinson's case might well be stronger if, after raising doubts about the purported reason for her treatment, the only plausible reason left appeared to be discrimination.[3]  In any event, the pretext inquiry is heavily fact-specific, Zapata-Matos, 277 F.3d at 45, and in this case Dartmouth's judgment on Sabinson, whether or not correct, shows no plausible taint of having been made on grounds of gender, religion, or age.

As to the retaliation claim, the review committee's recommendation to "marginalize" Sabinson in her course assignments -- if she failed to accept a retirement package -- was made in the May 31, 2005, report, and the decision to follow this course was made at the June 3 meeting.  The partly unattractive August 16 assignments, although occurring after Sabinson's agency complaints on August 8, were the carrying out of a plan avowed well before the complaint and therefore not even arguably caused by the complaint.

This failure to show causation is fatal to Sabinson's retaliation claim.  See, e.g., Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007).  The filing of a complaint cannot be the basis for adverse employment action but it also cannot immunize an employee from action already planned and not dependant

_____

[3]See Reeves, 530 U.S. at 147-48 (noting that, while a factfinder generally can consider employer's dishonesty about its true motivation as evidence of guilt and might be able to draw an inference of discrimination from pretext, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision"); Thomas, 183 F.3d at 61.

-10-

on the complaint.  Absent a decision by Sabinson to retire, unwelcome assignments were inevitable regardless of the complaint.

Affirmed.