Grafton
No. 2009-438

## MARA SABINSON

### v.

## TRUSTEES OF DARTMOUTH COLLEGE

Argued: March 24, 2010
Opinion Issued: June 30, 2010

*Clauson Atwood & Spaneas*, of Hanover (*K. William Clauson* on the brief and orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Bruce W. Felmly & a.* on the brief, and *Mr. Felmly* orally), for the defendant.

DUGGAN, J. The plaintiff, Mara Sabinson, appeals an order of the Superior Court (*Vaughan*, J.) granting summary judgment in favor of the defendant, the Trustees of Dartmouth College. We affirm.

I

The following facts appear in the record. Sabinson is a professor in the Dartmouth College Theater Department. She was hired as a full-time faculty member in 1985, and obtained tenure in 1991. In July 2001, Lenore Grenoble, who was Associate Dean for the Faculty of the Humanities, became chair of the Theater Department because the Dean of the Faculty placed the department into "receivership." Grenoble testified that the Dean placed the department into "receivership" because of the contentious

atmosphere within the department, which suggested a need for "external leadership"; "the inability of the faculty . . . to work together was interfering with the ability of the department to serve the needs of the students."

Subsequently, Grenoble reassigned one of Sabinson's advanced acting classes and her directorship of the 2005-2006 main stage production. In 2005, a committee of three professionals conducted a partial review of the Theater Department, and produced a report detailing its findings (Committee Report) in May 2005. The committee made a variety of recommendations about personnel and related issues, curriculum, performance experience and culminating projects, and professional and pre-professional alliances. The committee also authored a confidential letter concluding that "the Theater Department has suffered grievously from the presence of Mara Sabinson." Specifically:

> Those interviewed, faculty and students alike, depict the corrosive influence of [Sabinson]. We heard various anecdotes of her harsh treatment of students both in class and (when she was directing) in rehearsal; of her unfavorable comments to students about the work and ideas of her colleagues; of her uncollegial behavior in Department meetings; of the threat she was felt to represent to junior and adjunct colleagues.

The committee recommended that Dartmouth "persuasively offer[] [Sabinson] a retirement package" and "marginalize[] [her] to certain courses."

Provost Barry Scherr, Dean of the Faculty Carol Folt, and Grenoble testified that they met with Sabinson on June 3, 2005, and discussed the findings of the committee, offering her an early retirement package and changing her teaching assignments. Sabinson alleges that Grenoble, Folt and Scherr did not disclose the committee's findings to her during this meeting.

On June 6, 2005, Sabinson met with Ozzie Harris, Special Assistant to the President for Institutional Diversity and Equity, to discuss her situation. On June 10, Sabinson's counsel contacted Dartmouth and alleged that Dartmouth had violated Sabinson's rights as a tenured professor and had constructively discharged her. Sabinson then filed a Grievance Report Form with Harris against Scherr, Folt, Grenoble, and Margaret Spicer, another professor in the Theater Department.

On August 16, 2005, Grenoble sent Sabinson an email offering Sabinson the opportunity to teach "Acting for the Camera and three first-year seminars, to be designed on the topic of your choice" for the 2005-2006 academic year. Sabinson replied:

I already heard from you as to my schedule for the current year by your e mail of 11-18-2004 when you were chair of the department. You should pass your new thoughts on to the new chair. I regard your thought of courses outside of the department to be the harassment which you promised if I did not accept your terms.

The next day, Grenoble responded that her "proposal does not contain any reference to teaching outside the department. 'Acting For the Camera' and the 'First Year Seminars' would all be Theater Department Courses, if you are assigned to teach those courses."

Subsequently, Sabinson filed a complaint with the Equal Employment Opportunity Commission (EEOC) and the New Hampshire Commission on Human Rights. Sabinson later filed suit against Dartmouth in federal district court, alleging discrimination based upon her age, gender, and religion, retaliation, breach of contract, and wrongful discharge and demotion. The district court dismissed the constructive discharge claim, and granted Dartmouth's motion for summary judgment on the remaining claims other than the contract claim, over which it declined to exercise pendant jurisdiction. The First Circuit Court of Appeals affirmed. *Sabinson v. Trustees of Dartmouth College*, 542 F.3d 1, 3 (1st Cir. 2008). Subsequently, Sabinson filed a breach of contract claim against Dartmouth in the superior court, and the court granted summary judgment in favor of Dartmouth.

## II

On appeal, Sabinson's primary arguments are that the trial court erred by: (1) ruling that Dartmouth was not required to comply with certain procedural requirements; (2) finding that Sabinson did not have a contractual right to teach certain courses; (3) failing to comply with RSA 491:8-a; and (4) failing to rule upon her motion to strike Dartmouth's response to her objection to the motion for summary judgment and failing to grant her motion for thirty days to respond.

When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and inferences properly drawn from them, in the light most favorable to the non-moving party. *S.N.H. Med. Ctr. v. Hayes*, 159 N.H. 711, 715 (2010). If this review does not reveal any genuine issues of material fact, *i.e.*, facts that would affect the outcome of the litigation, and if the moving party is entitled to judgment as a matter of law, we will affirm. *Id.* We review the trial court's application of the law to the facts *de novo*. *Id.* Summary judgment is most effectively used in breach of written contract or debt cases. *Iannelli v. Burger King Corp.*, 145 N.H. 190, 192 (2000).

## III

We first consider Sabinson's argument that the reassignment constituted disciplinary action under the Agreement, and that Dartmouth failed to comply with the procedures set forth therein. Sabinson also contends that the trial court erroneously concluded that she waived her procedural protections under the Agreement. Dartmouth counters that the assignment was not "disciplinary action" because it was not a "major change in the conditions of employment that diverge from the ordinary agreements."

Since 2005, Sabinson has taught the following courses:

Theater 34, Winter 2006, *Acting for the Camera*

Theater 7, Winter 2006, *Acting Issues*

Theater 7, Spring 2006, *Theater for Social Change*

Theater 10, Spring 2006, *Edward Albee*

Theater 10, Winter 2007, *Newspaper Theater*

Theater 7, Winter 2007, *Theater for Social Change*

Theater 10, Spring 2007, *Cabaret*

Theater 7, Spring 2007, *Theater for Social Change*

Theater 21, Winter 2008, *Topics in American Theater*

Theater 7, Winter 2008, *Theater for Social Change*

Theater 7, Spring 2008, *Theater for Social Change*

Theater 7, Spring 2008, *Theater for Social Change*

Theater 7, Fall 2008, *Theater for Social Change*

. . .

Theater 7, Spring 2009

Theater 7, Spring 2009.

Dartmouth has promulgated an Agreement Concerning Academic Freedom, Tenure, and Responsibility of Faculty Members (Agreement) as part of the Organization of the Faculty of Dartmouth. The Agreement provides: "Disciplinary action against a faculty member for unsatisfactory service . . . requires adequate cause." "Such action may include termination of an appointment with tenure . . . involuntary leave from College duties, or any other major changes in the conditions of employment that diverge from the ordinary agreements." The Agreement sets forth procedures to be followed when determining "whether adequate cause exists for any disciplinary action and to recommend appropriate action to the Trustees:

a. Allegations that adequate cause exists for disciplinary action shall first be considered by the Dean of the appropriate fac-

ulty . . . . If mutually agreeable arrangements cannot be made between the Dean and the faculty member, the Dean shall transmit the allegations to the appropriate committee of his or her faculty.

b. The Committee shall examine the allegations and their sources in preliminary, informal proceedings. If agreement with the faculty member on a satisfactory disposition is not reached and the Committee finds the evidence warrants, the Committee shall state the allegations with reasonable particularity, citing their sources and the reasons why, if the allegations are substantially true, they might constitute adequate cause for disciplinary action. This statement shall be transmitted to the Council on Academic Freedom and Responsibility for further action.

The Handbook of the Faculty of Arts and Sciences (Handbook) also contains a grievance procedure for complaints regarding faculty members. Dartmouth also has procedures for "Equal Opportunity Grievances" and complaints against faculty.

The trial court considered the portion of the Agreement that provides that "[d]isciplinary action against a faculty member for unsatisfactory service . . . may be effected by the College only for adequate cause." Under the Agreement, "[s]uch action may include termination of an appointment with tenure, termination of a nontenured appointment before the end of its specified term, involuntary leave from College duties, or any other major changes in the conditions of employment that diverge from the ordinary agreements." The trial court concluded that, under these circumstances, the procedural protections apply whether or not a faculty member files a complaint.

However, the trial court concluded that the reassignment did not constitute "[d]isciplinary action" because it was not enumerated in the Agreement and did not constitute a "major change[] in the conditions of employment that diverge from the ordinary agreements." Noting that the Agreement does not define "major change" or "ordinary agreements," the trial court reasoned that the disciplinary actions specifically described by the Agreement "entail discontinuation of employment" or "discontinuation of compensation." Unlike the enumerated actions in the Agreement, the reassignment was neither a reduction in employment nor a reduction in benefits. The trial court concluded that Sabinson's course assignment was not a "major change" because it was not "an inequitable division of labor, rather than the default four courses per year," or a "shift from a full-time position to something less." The trial court also rejected Sabinson's contention that the assigned writing courses fell "outside of her depart-

ment," finding that "the evidence does not support any dispute of material fact, or factual support at all, for [her] characterization."

Sabinson makes several arguments in support of her contention that the reassignment was a "major change." Specifically, she argues that: (1) the courses were part of a separate first year writing program outside of the theater department; (2) the assignment was both unprecedented and a humiliating punishment; (3) the reassignment destroyed her career and was therefore similar to the enumerated examples in the Agreement of a "major change"; (4) determining what constitutes a "major change" required hearing factual evidence; and (5) the reassignment after the beginning of the academic year was "outside the 'ordinary agreements.'" Dartmouth counters that Sabinson has failed to offer evidence of any "ordinary agreements" that would govern her course assignments, and argues that the evidence demonstrates that Dartmouth did not discipline Sabinson.

■ We assume without deciding that the Agreement was a contract between Dartmouth and Sabinson. The interpretation of a contract is ultimately a question of law for this court to decide. *Foundation for Seacoast Health v. HCA Servs. of N.H.*, 157 N.H. 487, 492 (2008). Accordingly, we review a trial court's interpretation of a contract *de novo*. *Id.* We focus on the intent of the parties at the time of the agreement, and, in the absence of ambiguity, we determine the parties' intent from the plain meaning of the language used. *Id.* We assign the words and phrases used by the parties their common meaning, and ascertain the intended purpose of the contract based upon the meaning that a reasonable person would give to it. *Id.*

■ We agree with the trial court that the reassignment was not a "major change." As noted above, the Agreement provides that "[d]isciplinary action against a faculty member for unsatisfactory service . . . requires . . . adequate cause. Such action may include termination of an appointment with tenure, termination of a nontenured appointment before the end of its specified term, involuntary leave from College duties, or any other major changes in the conditions of employment that diverge from the ordinary agreements." The common meaning of "major" is "large, great . . . notable or conspicuous in effect or scope . . . considerable, principal . . . serious." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1363 (unabridged ed. 2002). The common meaning of "change" is "to make different . . . alter, modify . . . to give a different position, status, course, or direction to." *Id.* at 373. The contract lists examples of "major changes," which involve, as the trial court noted, the cessation of employment and/or compensation. Here, Sabinson has neither been terminated nor placed on involuntary leave, but

has been assigned to teach writing courses. Based upon the plain language of the contract and the common meanings of the words "major" and "change," we conclude that, as a matter of law, the reassignment was not a "major change." Accordingly, Dartmouth was not required to follow the procedures set forth in the Agreement.

## IV

■ Sabinson next argues that she had a specific "assignment [to teach certain courses] as of the beginning of the academic year on July 1, 2005," but Dartmouth breached that agreement when, following her EEOC complaint, Grenoble assigned her to teach three first year writing courses. Before the trial court, Sabinson argued that

> she had substantive rights to teach her preapproved, published courses, Theater 31 and Theater 34 . . . and Theater 30 . . . because of both a specific contract to teach those four courses formed by [Dartmouth's] publication of the 2005-2006 course offering list . . . and [Dartmouth's] budgetary policy of establishing course allocations one year in advance . . . and because of her contract of tenured employment.

Sabinson has failed to explain which of these arguments, if any, she relies upon on appeal. We decline to speculate. Because Sabinson has failed "to provide adequately developed legal argument and legal support," we will not address them. *See Motorsports Holdings, LLC v. Town of Tamworth,* 160 N.H. 95, 112 (2010). Moreover, Sabinson cites no authority for the proposition that a tenured professor has a contractual right to teach specific courses. *Cf. Cussler v. Univ. of Maryland,* 430 F. Supp. 602, 608 (D. Md. 1977) (noting that faculty members must "adapt their schedules to conform [to] the needs of the department and the capabilities of other faculty members" as "[n]o faculty member has a vested right in any course").

## V

Next, Sabinson alleges that the trial court failed to comply with RSA 491:8-a because the court erroneously: (1) applied the wrong burden of proof when it relied upon facts established by the federal district court; and (2) ignored certain statements and evidence.

We first consider Sabinson's argument that the trial court improperly relied upon facts established by the federal district court. Dartmouth counters that "[t]here is no evidence that the trial court relied on the district court's findings," but that, if the trial court did so rely, both parties are bound by those facts under the doctrine of collateral estoppel.

Under RSA 491:8-a, III, the moving party has the burden to demonstrate that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Iannelli*, 145 N.H. at 192. When considering a motion for summary judgment, the trial court cannot weigh the contents of the parties' affidavits and resolve factual issues, but must determine whether a reasonable basis exists to dispute the facts claimed in the moving party's affidavits at trial; if so, the trial court must deny the motion for summary judgment. *Id.* at 191-93. A fact is material if it affects the outcome of the litigation. *Weeks v. Co-Operative Ins. Cos.*, 149 N.H. 174, 176 (2003).

■ The trial court stated, in the "Factual Background" section of its summary judgment order, that it "finds the following facts, as determined by the federal courts that decided Sabinson's original claims, relevant." However, when the trial court addressed the parties' arguments, it relied upon the Agreement, the Handbook, and a document entitled "Overview of the Department of Theater at Dartmouth." Sabinson does not dispute the contents or existence of these documents, and there is no indication that the trial court applied the wrong standard of proof.

We next consider Sabinson's argument that the trial court erroneously ignored certain statements and evidence. Specifically, Sabinson argues that: (1) the trial court relied upon the Committee Report recommending that she "be marginalized to certain courses" but ignored her affidavit and Professor "Saccio's testimony and notes . . . that these were the Committee's instructions in the first place"; (2) it is "untrue" that Grenoble, Folt and Scherr discussed the committee's report with Sabinson on June 3, 2005; (3) the trial court omitted her statement that she would "never again" teach a first year writing class and that the faculty did not suggest that she change her teaching assignment for the 2005-2006 academic year until shortly after she filed a complaint with the EEOC; (4) the trial court ignored her complaint to Scherr and counsel for Dartmouth in June 2005; and (5) the order granting summary judgment to Dartmouth omitted that "no tenured professor had ever been assigned to teach" a first year writing seminar. Sabinson also alleges that, because the Grenoble and Sabinson affidavits contradict each other, and Grenoble's affidavit contains "false" statements and claims, these are "[i]ssues of credibility" that should be resolved by a jury. Finally, Sabinson alleges that the trial court erroneously ignored her affidavit, which "is obviously relevant to summary judgment on her contract claim," and that the trial court relied upon disputed evidence.

Dartmouth contends that the trial court correctly concluded that there were no genuine issues of material fact "because the affidavit testimony [that] Sabinson contends requires credibility determinations is not material

to her breach of contract claim." We agree. Even assuming the truth of Sabinson's allegations, none of the factual disputes that she highlights are "material" to the primary issues in this case, which are: (1) the nature and existence of a contract between Sabinson and Dartmouth; and (2) whether Dartmouth breached that agreement. *See Weeks*, 149 N.H. at 176 (fact is "material" if it affects outcome of the litigation). Accordingly, we cannot conclude that the trial court erred.

## VI

Finally, we consider Sabinson's argument that the trial court erroneously permitted Dartmouth to file a responsive pleading to her objection to Dartmouth's motion for summary judgment. Following Dartmouth's responsive pleading, Sabinson moved to strike. The trial court granted Dartmouth's motion for summary judgment. Sabinson argues that the trial court erroneously permitted Dartmouth to file its responsive pleading without ruling on her motion to strike, or, alternatively, granting her thirty days to respond. Sabinson contends that Dartmouth's response to her objection was "contrary to RSA 491:8-a" and her due process rights. Dartmouth counters that RSA 491:8-a does not prohibit its responsive pleading, and that the trial court had the discretion to permit it.

We conclude that the decision to permit Dartmouth's responsive pleading was within the trial court's discretion. Neither RSA 491:8-a nor the Superior Court Rules prohibit the trial court from permitting Dartmouth to file such a pleading, as both are silent on the subject. "The power of the judiciary to control its own proceedings, the conduct of participants, the actions of officers of the court and the environment of the court is absolutely necessary for a court to function effectively and do its job of administering justice." *State v. LaFrance*, 124 N.H. 171, 179-80 (1983) (noting that "the judiciary is in charge of the courtroom"); *see In re Proposed Rules of Civil Procedure*, 139 N.H. 512, 513 (1995). As such, the trial court enjoys the discretion to regulate the proceedings before it. *See, e.g.*, SUPER. CT. R. Preface ("As good cause appears and as justice may require, the court may waive the application of any rule."); *Petition of Haines*, 148 N.H. 380, 381 (2002) (generally, control over breadth and scope of pre-trial discovery left to the sound discretion of trial court); SUPER. CT. R. 94 (trial court has discretion to decide whether to hear motion to suppress before or during trial). "[J]udgment, and any necessary process for carrying it into effect, being directed to the ends of justice, cannot be obstructed by imaginary barriers of form." *In re Proposed Rules of Civil Procedure*, 139 N.H. at 516 (quotation omitted).

To show that the trial court's decision is not sustainable, Sabinson must demonstrate that it was clearly untenable or unreasonable to the prejudice of her case. *State v. Lambert*, 147 N.H. 295, 296 (2001). Based upon the record before us, we cannot conclude that the trial court unsustainably exercised its discretion when it permitted Dartmouth to file a supplemental pleading. Neither party has provided us with Sabinson's motion to strike Dartmouth's reply. Sabinson disputes arguments and factual representations made by Dartmouth in its reply, and contends that "Dartmouth cites deposition testimony in its Reply to which Professor Sabinson never had an opportunity to respond." Sabinson also contends that this testimony is "untrue." Sabinson, however, does not specifically identify the testimony to which she is referring, and does not explain how the admission of this testimony was "clearly untenable or unreasonable to the prejudice of [her] case." *Id.* Accordingly, we cannot conclude that the trial court unsustainably exercised its discretion when it permitted Dartmouth to file its reply.

We have reviewed Sabinson's remaining arguments and hold that they are without merit and do not warrant further discussion. *Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

HICKS, J., concurred; BROCK, C.J., retired, specially assigned under RSA 490:3, concurred.