Sylvester D. ANDERSON Jr., Plaintiff,

v.

John E. POTTER, Postmaster General of the United States Postal Service, Defendant.

Civil Action No. 08–12075–WGY.

United States District Court, D. Massachusetts.

July 13, 2010.

---

Rachael S. Rollins, Michael P. Sady, United States Attorney's Office, Boston, MA, for Defendant.

Cornelius J. Sullivan, Mattapan, MA, for Plaintiff.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

At best this is a weak case—so weak that it requires the Court carefully to explore the boundaries of reasonable inferences a jury may permissibly draw. The Plaintiff, Sylvester D. Anderson Jr.

("Anderson"), a United States Postal Service ("USPS") employee, here makes a claim for discrimination on the basis of race, sex, and age,[1] and for retaliation for prior Equal Employment Opportunity ("EEO") complaints. The Defendant, John E. Potter, Postmaster General of the USPS ("Potter") moves for summary judgment on Anderson's claims.

At this Court's summary judgment hearing on May 18, 2010, Anderson conceded his retaliation claim. This Memorandum and Order, therefore, concerns only Anderson's claim for discrimination.

## A. Procedural Posture

On July 25, 2007, Anderson filed an EEO Complaint with the USPS, alleging employment discrimination. Def.'s Mem. Ex. Q. On June 18, 2008, a hearing officer within the Equal Employment Opportunity Commission ("EEOC") found, in his decision, that "[Anderson] has failed to meet his burden of proving race, sex, age, or retaliation discrimination." Def.'s Mem. Ex. R. at 5. A Notice of Final Action ("Notice") was issued by the USPS on June 24, 2008. Def.'s Mem. Ex. S. Anderson filed an appeal from the Notice. The EEOC, in its decision of September 19, 2008 regarding Anderson's appeal, agreed with the EEOC hearing officer that Anderson "failed to rebut the agency's legitimate, nondiscriminatory reasons for the alleged action." EEOC Decision 2. Anderson filed his Complaint with this Court on December 15, 2008 and Potter filed his Answer on August 25, 2009. Potter subsequently filed a Motion for Summary Judgment on April 16, 2010.

## B. Undisputed Facts

, Anderson is an African–American male employed by the USPS. Compl. ¶ 1. He was sixty-nine years old at the time he filed his complaint. Id. He has worked as a postal clerk for approximately twenty-six years. Id.

At the relevant time, Anderson worked in the Roxbury section (also called the Roxbury Performance Cluster) of the Boston Postal District. Pl.'s Opp'n at 2 ¶ 1. The Roxbury section consists of the Roxbury Post Office main branch and four substations: Mission Hill, Grove Hall, Cathedral, and Upham's Corner. All four sub-stations are retail offices. Id. at 2 ¶ 2. Anderson was, at the relevant time, the Lead Clerk at the Mission Hill sub-station and his working hours were Tuesday to Saturday from 9:30 a.m. to 6:00 p.m.,[2] with Sundays and Mondays off. Id. at 2 ¶ 3.

At the time to which the Complaint refers, Marybeth Darcy ("Darcy"), a white female born in 1968 with an entry date of service of August 15, 1987, was employed as the Lead Clerk in the Grove Hall substation. Id. at 2 ¶ 4.

In January 2007, budget cuts were implemented by USPS management. Id. at 3 ¶ 5. Due to these cuts, staffing at three of the sub-stations in the Roxbury section was reviewed. See EEOC Decision 2. As a result of this review, "some part time jobs at Upham's Corner and Mission Hill were abolished and combined into a floater position between two offices. [Anderson's] position was not abolished since there was no need to change the Lead Clerk position at the Mission Hill office." Id. In addition, the budget cuts resulted in Darcy's posi-

---

**1.** Although Anderson does not make a claim for discrimination on the basis of sex and age in his Complaint, these claims are discussed in his EEOC action, Def.'s Mem. Exs. R, S, and are also addressed by Potter in his motion for summary judgment, Def.'s Mem.

**2.** His working hours are described slightly differently by the Station Manager, David W. Yench, in his EEO Investigative Affidavit as being from 7:00 a.m. to 3:30 p.m. on Saturdays, Def.'s Mem. Ex. J., however, this adds up to the same number of hours per day.

tion being abolished and established as a new position with different working hours (reduced by one and a half hours per day; 9:00 a.m. to 5:00 p.m. each day compared to 9:30 a.m. to 6:00 p.m.) and Saturdays and Sundays off (compared to Sunday and Monday off). *See id.;* Def.'s Mem. Ex. J. The new position was put out to bid and awarded to Darcy. *Id.* at 5 ¶ 11.

Anderson alleges employment discrimination because he was not allowed to bid for the new position and it was given to a "younger, white female with less seniority." Pl.'s Opp'n at 1.

## II. ANALYSIS

The burden of proof in this discrimination case is determined according to the principles set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McDonnell Douglas* arose under Title VII of the Civil Rights Act of 1964 ("Title VII"), and thus applies to claims of racial and sex discrimination. *Id.* at 793–94, 93 S.Ct. 1817; *see* 42 U.S.C. § 2000e–2(a)(1) (prohibiting workplace discrimination because of an employee's race, color, religion, sex, or national origin). Alleged discrimination on the basis of age, however, is governed by the Age Discrimination in Employment Act ("ADEA") of 1967. 29 U.S.C. § 623(a)(1). As the EEOC points out, *McDonnell Douglas's* principles traditionally have been applied by analogy to ADEA cases. Def.'s Mem. Ex. R. at 3.

This application, however, has recently been called into question by the Supreme Court. In *Gross v. FBL Financial Services, Inc.,* the Court ruled that not all Title VII legal frameworks are applicable to the ADEA. —— U.S. ——, 129 S.Ct. 2343, 2349, 174 L.Ed.2d 119 (2009) (holding Title VII's mixed-motives framework inap-

plicable to the ADEA).[3] Whether *McDonnell Douglas's* framework still applies, however, is a question yet to be answered by the Court. *Id.* at 2349 n. 2 (stating the Court has not "definitively decided" whether *McDonnell Douglas* applies to the ADEA); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (assuming *arguendo* that *McDonnell Douglas* applies to the ADEA only because the parties did not dispute such application). This Circuit continues to apply *McDonnell Douglas* to ADEA cases. *Velez v. Thermo King de Puerto Rico, Inc.,* 585 F.3d 441, 446 & n. 2 (1st Cir.2009). Accordingly, the *McDonnell Douglas* familiar three-stage burden-shifting framework governs Anderson's entire discrimination claim.

Anderson "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp.,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Anderson thus must show: "(i) that he is a member of a protected class; (ii) he was qualified for the job; (iii) the employer took an adverse employment action against him; and (iv) the position remained open or was filled by a person with similar qualifications." *Kosereis v. Rhode Island,* 331 F.3d 207, 212–13 (1st Cir.2003). Once he does so, he has created a presumption of unlawful discrimination and "the burden then shifts to [defendants] to articulate a legitimate, non-discriminatory reason for [their] employment decision and to produce credible evidence to show that the reason advanced was the real reason." *Tobin v. Liberty Mutual Ins. Co.,* 433 F.3d 100, 105 (1st Cir.2005) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817).

If the employer does so, the presumption of unlawful discrimination disappears

---

**3.** *See* Melissa Hart, *Procedural Extremism: The Supreme Court's 2008–2009 Labor and Employment Cases,* 13 Employee Rts. & Emp.

Pol'y J. 253, 264–65 (2010) (criticizing *Gross* ).

and Anderson's prima facie case is prima facie no longer, *i.e.* proof of the four elements listed above, standing alone, will not carry the case to the jury. Even so, Anderson must "be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817. To establish that a defendant's proffered non-discriminatory purpose for the employment action is a pretext for discrimination, a plaintiff must show that it is "more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *See Ronda–Perez v. Banco Bilbao Vizcaya Argentaria–Puerto Rico*, 404 F.3d 42, 45 (1st Cir. 2005) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir.2000)). "At the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was ... discrimination." *Quinones v. Buick*, 436 F.3d 284, 289–90 (1st Cir. 2006) (internal quotation omitted). At this stage, however, the Court must disregard the employee's proffered explanation if it is dependent on evidence that a jury might not credit. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097 ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.");[4] *see also* Robert S.

---

4. *Reeves* is a most important decision for summary judgment, applicable beyond the employment discrimination context, *see, e.g., In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009); *Edell & Assoc., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424 (4th Cir.2001); *Williams v. White Plains*, No. 08 Civ. 5210, 718 F.Supp.2d 374, 377, 2010 WL 2465405, at *1 (S.D.N.Y. Jun. 16, 2010), yet the Supreme Court in *Reeves* was less than pellucid concerning how its "disregard" direction works within the *McDonnell Douglas* framework, leading the First Circuit to conclude that the "disregard" direction "would lead to absurd consequences" if applied at stage (2) where the employer bears the burden of going forward to articulate a legitimate non-discriminatory reason for the alleged job action. *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 856 (1st Cir.2008) (citing *Stratienko v. Cordis Corp.*, 429 F.3d 592, 598 (6th Cir.2005)) (internal quotations omitted). This makes eminent sense. Surely the Supreme Court did not mean to impose a duty on the employer to proffer evidence and, at the same time, cripple its ability to do so.

It is at stage (3), where the employee—having seen the presumption of discrimination evaporate—is trying to prove pretext that the Supreme Court's "disregard" direction comes into play. This too makes eminent sense.

This is precisely what the First Circuit, after considering *Reeves*, did in *Dennis*. *Dennis*, 549 F.3d at 859. Unfortunately, it is not what the court said. The ratio decidendi of *Dennis* is markedly undercut by its reliance on the Third Circuit's decision in *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259 (3d Cir.2007), especially in quoting that court's dictum, "The fact is that in considering a motion for summary judgment the [district] court should believe uncontradicted testimony unless it is inherently implausible." *Id.* at 272.

The quoted passage is most assuredly wrong. Not only does it directly fly in the face of *Reeves'* command, it misconceives the very nature of summary judgment. Assuming that the evidentiary material before the district court is competent under Federal Rule of Evidence 601, the district court in resolving a motion for summary judgment, has no role at all in deciding whether such evidence is "plausible" or whether to "believe" it. Those are matters which the Seventh Amendment reserves for the jury. The district court's role at summary judgment is closely akin to ruling on a motion for judgment as matter of law, Fed.R.Civ.P. 50. The trial judge **must** accept all admissible evidence that favors the non-moving party and all other clearly undisputed evidence, ignore the rest, and indeed must draw all reasonable inferences in favor of the

Mantell, *Summary Judgment: The Real World,* 31st Ann. Lab. & Emp. L. Spring Conf. 275, 276 (Mass. Bar Ass'n, Mar. 11, 2010) ("To rely at summary judgment on evidence that a jury need not believe would be to engage in improper fact-finding.").

## C. Anderson's Prima Facie Case

■ Potter argues that Anderson cannot show that he was qualified for the job or that the position was filled by a person with similar qualifications. Def.'s Mem. at 9. Anderson had the requisite experience and seniority (his position was already that of a "Lead Clerk") for the Lead Clerk position filled by Darcy. Potter argues, however, that only current employees at the Grove Hall station were allowed to apply for the new jobs. He cites the Collective Bargaining Agreement between the American Postal Workers Union and the USPS ("CBA"), which states: "[i]n the Clerk Craft, when excessing from a section occurs . . ., any duty assignments remaining within the section occupied by Clerks junior to the senior Clerk whose duty assignment was abolished will be posted for bid to currently qualified Clerks within the section." Def.'s Mem. Ex. M. at art. 37.3.B.2. A "duty assignment" is defined as "[a] set of duties and responsibilities within recognized positions regularly scheduled during specific hours of duty." *Id.* at art. 37.1.B. "Abolishment" is defined as "[a]

management decision to reduce the number of occupied duty assignment(s) in an established section and/or installation." *Id.* at art. 37.1.E.

Potter argues that Anderson, who worked at Mission Hill rather than Grove Hall, "was not 'within the Section' where the position sought was posted, and, thus, was disqualified from bidding for the position by the applicable CBA." Def.'s Mem. at 9. "The only postal workers who were qualified to bid for the Lead Clerk position at Grove Hall were the postal workers that met all of the requirements of the position and actually worked at the Grove Hall station at the time of reposting." *Id.*

The issue, thus, is whether each substation is an independent "section" or whether the four sub-stations are in the same "section." To establish the meaning of a "section," Potter turns to the Memorandum of Understanding between USPS, Boston, MA 02205 and Clerk Craft, Boston Metro Area Local American Postal Workers Union, which provides that "each station, branch, and unit is considered its own 'section' for purposes of assessing reassignments, as well as for purposes of bid posting." Def.'s Mem. Ex. O at arts. 12(A)(1)-(3), 12(D). In addition, Potter points to the local rules for implementation of the CBA to show that the "identification of assignments which comprise a 'section' are to be determined locally by local negotiations."[5] Def.'s Mem. 4 ¶ 9; *id.* Ex. N

---

non-moving party. The trial judge rules as matter of law and review by the court of appeals is, appropriately, de novo.

All this is so clear as to require no extensive citation. The problem with the quoted passage from *Lauren W.* is that it impermissibly conflates the jury's fact finding role with the court's law explaining role, unconstitutionally marginalizing the jury and draining the court's judgments of their full moral force. It is this judicial mindset that evokes much of the most telling criticism of our processes. *See, e.g.,* Arthur Miller, *The Pre-trial Rush to Judgment: Are the "Litigation Explosion,"*

*"Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?,* 78 N.Y.U. L.Rev. 982 (2003); Suja Thomas, *Why Summary Judgment is Unconstitutional,* 93 Va. L.Rev. 139 (2007); Suja Thomas, *The Fallacy of Dispositive Procedure,* 50 B.C. L.Rev. 759 (2009); Richard L. Steagall, The *Recent Explosion in Summary Judgments Entered by the Federal Courts Has Eliminated the Jury from the Judicial Power,* 33 S. Ill. U.L.J. 469 (2009).

5. Although it is unclear how this is to be determined or by whom.

at art. 30(B)(18). Potter concludes from this that "each retail satellite office (e.g., Grove Hall, Mission Hill, etc.) is considered its own section for purposes of such reassignments and related bid posting." *Id.* at 4–5 ¶ 9.

Anderson argues to the contrary. He refers to "[a]n official listing of all the Postal Facilities," Pl.'s Opp'n at 3 ¶ 9; Def.'s Mem. Ex. L., to show that the "Roxbury Postal Performance Cluster is set forth as one unit, designated as Site ID No: 24–0093–0119. The sub-stations are not set forth separately." Pl.'s Opp'n at 4 ¶ 10. He goes on to state that "[t]here is no mention of 'sub-stations' as separate sections in any of the governing documents," *id.* at 4 ¶ 11, and "[t]here is no definition of 'section' which describes the 'satellite station' or 'sub-station' as a separate or distinct entity for bidding purposes in any of the governing documents. Personnel are supervised by the same individuals, located at the DMU [Roxbury Post Office main branch], who are responsible for the four sub-stations." *Id.* at 4 ¶ 12. He argues that David W. Yench ("Yench"), the Station Manager, "chose to implement the mandated budget/staffing reductions by individual sub-stations.... This was his administrative decision, not one mandated by the CBA." *Id.* at 5. He argues that the result of restricting the eligibility to the employees of one sub-station is "ludicrous on its face. Grove Hall is a small sub-station with only a few employees working there and only one who would qualify." *Id.* at 6. He goes on to state that "[w]hat further undermines the Defendant's argument is the fact that, when Ms. Darcy later vacated the position, Ms. Armand became the new Lead Clerk in spite of the fact that she was from the Cathedral sub-station." *Id.* at 7.

Anderson thus points out a genuine issue of material fact; viz. whether Mission Hill and Grove Hall are in the same "section" entitling Anderson to bid for the position that was ultimately filled by Darcy. Although the listing of Postal Facilities to which Anderson refers is inconclusive (the context of the document is unclear), it is equally unclear, from the various extracts from the CBA, Local Rules, and Memorandum of Understanding provided by Potter, what constitutes a "section," and whether each sub-station is a free-standing "station, branch or unit" or part of a larger "station, branch or unit" comprising the other three sub-stations in the Roxbury section.

Potter makes the same argument regarding whether the position was "filled by a person with similar qualifications," arguing that Darcy was more qualified for the position because she "not only worked at the Grove Hall Station, but had held the Lead Clerk positon [sic] immediately prior to its abolishment and reposting." Def.'s Mem. at 9. Again the fact that Darcy worked at Grove Hall Station is only relevant if Grove Hall and Mission Hill are separate "sections" for purposes of bidding on the vacancy.

To support the argument that Darcy was more qualified because she held the lead clerk position prior to the change in hours, Potter cites two affidavits, one by the Roxbury Post Office Station Manager and one by the Customer Service Supervisor in charge of the four satellite retail stations. Both affidavits explain that the employees at Grove Hall were allowed to "canvas" into the new jobs at that substation. Def.'s Mem. Exs. J and K. Yet, the affidavits do not state that the employees were considered more qualified because they had previously been employed at Grove Hall. In countering this argument, Anderson suggests that it does not matter that Darcy held the abolished position because once a new position was created, "any qualified [c]lerks within the section"

can bid on the new position. Def.'s Mem. Ex. B, Article 37.3.B.2. The CBA is silent on providing favorable treatment to persons who held abolished positions. Thus, again, this argument is dependant on whether Grove Hall and Mission Hill are the same section.

Having identified an issue of fact as to whether he was qualified for the position and whether Darcy had similar qualifications, Anderson thus initially makes out a prima facie case of discrimination, as he can demonstrate that he is a member of protected classes, was arguably qualified for the job at issue, was not chosen for the job, and the job was given to someone with comparable qualifications not within his protected classes.

### D. Potter's Legitimate, Nondiscriminatory Reason for Anderson's Rejection

■ The burden of going forward thus shifts to Potter. Again, Potter reiterates that Anderson was ineligible to bid for the new position at Grove Hall. Further, Potter argues that this position was never available to any employee other than Darcy because the USPS was simply following the procedures necessary for changing Darcy's schedule. Def.'s Mem. at 10. In his statement of material facts, Potter states that "[t]he applicable CBA provisions require that in such circumstances as this in Grove Hall (i.e., where a duty assignment's non-scheduled days off need to be permanently changed) all jobs within the affected office need to be abolished, and new jobs (with new hours and schedules) need to be posted for bid in accordance with the procedures set forth in the CBA." Def.'s Mem. at 4 ¶ 8. Potter, however, does not cite to CBA provisions that dictate this procedure, instead Potter cites to numerous pieces of evidence explaining that the USPS needed to change the hours of operation at the Grove Hall substation, and two affidavits which explain that:

[a]ll the positions at the Grove Hall office were abolished and re-established to reflect the new hours of operation. For that reason, the employees assigned to [Grove Hall] were allowed to canvas into the new jobs based on seniority and the junior employees were excessed because the number of positions was reduced by one.

Def.'s Mem. Ex. K, Somefun Aff.; *see also* Def.'s Mem. Ex. J, Yench Aff. These affidavits suggest a belief that only Grove Hall employees were eligible for the new Grove Hall positions. This suggestion, even if unsupported by the CBA, provides a nondiscriminatory reason for overlooking Anderson—namely the belief that Darcy was the only employee eligible for the position under the CBA and local rules. The affidavits are therefore sufficient to rebut the presumption of prohibited discrimination and eliminate the prima facie effect of Anderson's case, thus imposing on him the additional requirement of proffering evidence from which the jury could reasonably infer that the employer's proffered explanation was actually a pretext for prohibited discrimination.

### E. Pretext

[3] In arguing that Potter's legitimate non-discriminatory purpose for hiring Darcy was pretext, Anderson points to the lack of support for Potter's justification in the CBA and local rules. Pl.'s Opp'n at 9. Even were the affidavits provided by Potter to be considered for the inference of a belief that only Grove Hall employees were eligible for these positions, Anderson has countered that inference by arguing that it is "premised upon an [sic] twisted interpretation of the CBA and underlying documents unsupported by the language of said documents." Pl.'s Opp'n at 9. As discussed earlier, the parties dispute whether Grove Hall was its own section for purposes of employment decisions. Therefore,

Anderson has raised an issue of fact regarding Potter's justification.

 While Anderson may have raised an issue of fact as to whether Potter's justification is pretext, Anderson has not provided evidence to show that the failure to open up bidding for the Grove Hall Lead Clerk position to employees in other substations was a **pretext for discrimination** as required in the First Circuit.[6] *See, e.g., Sabinson v. Trustees of Dartmouth College,* 542 F.3d 1, 4 (1st Cir.2008) (holding that even if the plaintiff had "produced evidence of pretext, ... [the] evidence did not tend to establish a discriminatory purpose"). At most, Anderson has established a misapplication of the CBA and related rules—a mere "business error." Anderson has not provided any evidence to suggest that the USPS made the business error because it was motivated by discrimination or that the business error was a cover for discrimination. As matter of law, no jury could reasonably infer the contrary.

## III. CONCLUSION

Accordingly, Potter's Motion for Summary Judgment [Doc. 12] is GRANTED.

SO ORDERED.

---

6. From the paucity of evidence presented for this summary judgment motion, it is apparent that little to no discovery was conducted prior to the submission of the memoranda. It is possible that Anderson could have saved himself from this Court's ruling by submitting an affidavit under Federal Rule of Civil Procedure 56(f) explaining what evidence he would seek during discovery.